**KNORR–NAHRMITTEL A.G., and CPC International, Inc., Plaintiffs,**

v.

**REESE FINER FOODS, INC., and Bascom Foods, Inc. and John Fressie, Defendants.**

Civ. A. No. 87–4569.

United States District Court, D. New Jersey.

Sept. 27, 1988.

Nies, Webner, Kurz & Bergert by Wm. Mack Webner, Arlington, Va., Hannoch Weisman P.A. by William Heller, Roseland, N.J., for plaintiffs.

Oblon, Fisher, Spivak, McClelland & Maier, P.C. by David J. Kera, Arlington, Va., Evans, Hand, Allabough & Amoresano by Douglas E. Arpert, Paterson, N.J., for defendants.

## OPINION

BARRY, District Judge.

Plaintiffs, Knorr–Nahrmittel A.G. ("Knorr") and CPC International ("CPC"), bring this action alleging federal and common law unfair competition against Reese Finer Foods, Inc. ("Reese"), Bascom Foods, Inc. ("Bascom"), and John Fressie. Plaintiffs, a manufacturer of dried soup mixes and its parent company respectively, now move for summary judgment on their claim that Reese uses, on a competitive product, trade dress confusingly and intentionally similar to their own. For the reasons that follow, the motion will be granted.

CPC markets its "Knorr" line of dried soups, imported from Switzerland, throughout the United States. CPC describes Knorr as the world's most popular dried soup and, whatever the exact percentages are, its United States sales are significant. In recent years, CPC has spent approximately 6.75 million dollars annually on advertising its line of dried soups on television and in print. Although in previous years CPC engaged in apparently little or no direct retail advertising, it has utilized the same distinctive packaging for thirty years.

Prior to late 1983 or early 1984, when it took over distribution itself, CPC sold

Knorr soups through independent distributors including Reese.[1] When Reese was dropped as a distributor[2] it was, in the words of its president, "without a dry soup mix" to complement its line of ethnic and specialty foods which it markets under its own name. Reese then contacted an Israeli company, OSEM, to manufacture a "Reese" line of dried soups for sale in the United States. Although Reese's president now affirms that he told OSEM to design the packaging to "use fresh spring-like colors that would reflect the attractive and appetizing flavor and quality of the soup mixes," Affidavit of John A. Freesie at ¶ 6, what OSEM ultimately designed for Reese is a package that plaintiffs claim is so similar to the Knorr package that not only is customer confusion likely, but that it was planned. In fact, the correspondence between Reese and OSEM reveals defendants' intentions to copy the packaging of the successful Knorr line. On June 16, 1985, OSEM's Export Manager, Izzet Ozdogan, wrote to defendant Fressie, Reese's president and sole shareholder of Bascom which controls Reese, to confirm a conversation held at a trade show:

Dear Mr[.] Fressie,

It was a pleasure meeting you in Chicago during the FMI Exhibition.

As we discussed, we can supply you with the quality soups that you are looking for *in a similar packaging to Knorr.* All that we need is the green light from you to start all the preparations....

Brief in Support for Summary Judgment, Exhibit 5 (emphasis added).

The immediate response from Fred Greenberg, Reese's vice-president, emphasized the Knorr connection:

We are very interested in pursuing a line of dehydrated soups *exactly like the Knorr line. The variety, packaging,* *and taste must be the same ones as Knorr ...*

*Id.* (emphasis added).

In November, 1985, Greenberg sent Ozdogan several samples of the Knorr packaging for OSEM's use in developing the Reese package. The transmittal letter again expressly referred to the Knorr line and requested that "particularly important and necessary" elements of the Knorr soup box be incorporated into the Reese package.

Both the Knorr and the Reese soups are sold in a paper box approximately 5⅞" × 5⅛". A direct comparison of the two products reveals that the Knorr package has several distinctive features. First, the upper half of the box is colored in a bright yellow. The bottom half of the box has a green background upon which is superimposed a picture of a prepared bowl of the product. In most cases, superimposed on the soup bowl are representations of the soup's main ingredients in either whole or raw form. The name "Knorr" is blazoned across the yellow strip in bright red bold faced script type. Below the name is the description of the product and its flavor, for example, "Vegetable Soup and Recipe Mix" in bold green block type. In at least one case, specifically its green pea soup, Knorr uses the term "soupmix" to describe the product.

Like the Knorr package, the Reese carton uses primary versions of green and yellow as the dominant colors. Yellow, as it does in the case of the Knorr package, covers the upper half. Below that is a green border approximating a chevron. The bottom half, again like the Knorr version, depicts a prepared bowl of soup juxtaposed with representations of the raw ingredients. Reese also announces its name across the yellow strip in red script and uses the term "soupmix" to describe its green pea soup. Despite the allegedly sim-

---

1. Neither Reese then, nor CPC now, are the only middlemen between the manufacturer and the ultimate consumer. Goods are next sold to wholesalers, who number 5,000 or more, and who then distribute the soup mixes to the tens of thousands of retail outlets that sell Knorr products.

2. Although CPC apparently offered to continue to provide Reese with product, the offer was by plaintiffs' own admission somewhat hollow. No wholesaler or retailer would buy from Reese when it could obtain the same product, for less money, directly from CPC.

ilar packages, sales of Reese soups, which are not advertised directly to the public, have been slow.

■ Knorr first informed Reese of its objections to its trade dress in July of 1987. When Knorr and CPC became impatient over Reese's promises to change its packaging, they filed this suit on November 12, 1987. The parties have now apparently agreed that Reese will change its carton on all soup manufactured in the future and defendants have submitted a design to plaintiffs which has been accepted as unobjectionable. However, still at issue are the thousands of packages of unsold product remaining on supermarket shelves and in the hands of Reese and other distributors. On March 24, 1988, a hearing was held on plaintiffs' application to enjoin defendants' use of the allegedly infringing packaging. The Court remarked from the bench its tentative conclusion that plaintiffs were likely to prevail on the merits of their infringement claim, but took the matter under advisement to reflect on the issue of laches.[3]

Within days of the hearing, while the matter was under advisement and with the knowledge that a decision by the Court, almost certainly adverse, was imminent, defendants sold, at a discounted rate, all of the remaining soup on hand, a quantity of soup that defendants' counsel had represented to the Court at oral argument would take six to nine months to sell. A hearing was held on April 13, 1988 to determine the best course to follow in light of the disturbing actions taken by defendants. After hearing the details of the sale and hearing the arguments of counsel, this Court made clear that it would enter an order directing "that the soup that has left the defend-

ant[s'] premises [ ] be returned to the defendant within one week from today." Defendants' counsel expressly represented to the Court that he had "called Mr. Greenberg [on April 12, 1988 and] I told him not to ship anymore soup." Trans. at 9. Despite this representation, defendants continued to ship product contending now, feebly and disingenuously, that they did not feel obligated to stop doing so until a formal order was entered. In any event, except for a subsequent appearance at a recent trade show, the goods in question remain warehoused.

Summary judgment under Federal Rule of Civil Procedure 56 will be granted only if there is no genuine issue of material fact and the moving party demonstrates entitlement to judgment as a matter of law. *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir.1976), *cert. denied*, 429 U.S. 1038, 97 S.Ct. 732, 50 L.Ed.2d 748 (1977). Procedurally, the moving party has the initial burden of identifying that portion of the record which demonstrates the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The burden then shifts to the non-moving party to " 'make a showing sufficient to establish the existence of [every] element essential to the party's case.' " *Equimark Commercial Finance Company v. C.I.T. Financial Services Corporation*, 812 F.2d 141, 144 (3d Cir.1987) (quoting *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552–53). Where the moving party is the plaintiff, a defendant may defeat summary judgment by demonstrating the existence of evidence which would support a jury finding in its favor on an element essential to the plain-

---

3. Defendants had contended in opposition to plaintiffs' application for a preliminary injunction that a key employee of CPC had been aware of Reese's packaging months before plaintiffs objected to its use. Obviously, this contention, if true, would have tended to undercut plaintiffs' claims of imminent and irreparable harm. *See, e.g., Citibank, N.A. v. City Trust*, 756 F.2d 273 (2d Cir.1985). However, defendants do not rely on the laches defense at this stage of the proceedings nor could they. Absent a claim of a delay so egregious that it amounts to abandonment of the mark or acquiescence in its use,

claims not made here, the issue of laches does not impact on plaintiffs' request for permanent injunctive relief. *See, e.g., Le Sportsac, Inc. v. Dockside Research, Inc.*, 478 F.Supp. 602, 609 (S.D.N.Y.1979); *Golden Door, Inc. v. Odisho*, 437 F.Supp. 956 (N.D.Cal.1977), *aff'd*, 646 F.2d 347 (9th Cir.1980). While laches could impact on the amount of damages or profits, *see, e.g., Finance Co. of America v. Bank America Corp.*, 502 F.Supp. 593 (D.Md.1980); *Johanna Farms, Inc. v. Citrus Bowl, Inc.*, 468 F.Supp. 866 (E.D.N.Y.1978), that issue is mooted by plaintiff's withdrawal of their request for monetary relief.

tiff's case. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (dispute is genuine if evidence would support verdict in favor of non-moving party). Although it may have once been considered inappropriate to grant summary judgment in certain types of cases, including such cases as trademark and patent in which it was assumed that issues tended to be complex and subjective, it is now settled that summary procedure may be used in any case so long as there are no genuine disputes concerning a fact deemed material by the substantive body of law controlling in the case. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

Section 43(a) of the Lanham Act [4] creates a federal cause of action comparable to the common law of unfair competition. *Williams v. Curtiss–Wright Corp.,* 691 F.2d 168, 172 (3d Cir.1982).[5] Included within the scope of this tort is the unprivileged imitation of the overall design or appearance of a product or its packaging, commonly referred to as the product's "trade dress." *American Greetings Corp. v. Dan–Dee Imports, Inc.,* 807 F.2d 1136, 1140, n. 2 (3d Cir.1986). In evaluating the product's appearance, a court should not focus mechanically on individual features, but, rather, should compare the overall appearance of the products at issue. Thus, "[t]rade dress is a complex composite of features ... [which must] be considered together, not separately." *SK & F, Co. v. Premo Pharmaceutical Laboratories,* 481 F.Supp. 1184, 1187 (D.N.J.1979), *aff'd,* 625 F.2d 1055 (3d Cir.1980); *see Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 153 (3d Cir.1984) (court should consider "total package").

■ In order to prevail on their claim of trade dress infringement, plaintiffs must demonstrate: 1) that the product's combination of features is not "functional;" 2) that the combination of features has acquired "secondary meaning;" and 3) that there is a likelihood that a consumer will confuse defendants' product for that of the plaintiffs. *American Greetings,* 807 F.2d at 1141.

■ Initially, it should be noted that defendants do not claim that they have copied features that are merely functional.[6] Rather, defendants claim that material issues of fact exist as to whether plaintiffs have shown secondary meaning and a likelihood of confusion. I reject this claim and will issue an order permanently enjoining defendants from utilizing the trade dress that is the subject of this suit.

■ Defendants first contend that a material issue of fact remains as to wheth-

---

**4.** Title 15, section 1125(a), provides that:

[a]ny person who shall affix, or annex, or use in connection with any goods or services, or any container for goods, a false designation of origin, or any false description or representation, ... shall be liable to a civil action by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.

*Id.*

**5.** Plaintiffs allege violations of federal law and of the "common law." The common law of this forum does not differ significantly from the law interpreting section 43(a). *SF & K Co. v. Premo Pharmaceutical Labs, Inc.,* 625 F.2d 1055 (3d Cir.1980).

**6.** Defendants had asserted in opposition to the application for injunctive relief that if they had copied any element of plaintiffs' trade dress at all, they had merely, and innocently, appropriated the use of the color yellow as the dominant color in the packaging. Since the use of a particular color cannot, in and of itself, constitute a protectible interest, defendants contend, plaintiffs cannot prove unfair competition. *First Brands Corporation v. Fred Meyer, Inc.,* 809 F.2d 1378 (9th Cir.1987); *but cf. In re Owens-Corning Fiberglas Corp.,* 774 F.2d 1116 (Fed.Cir. 1985) (recognizing pink as protectible when used to identify insulation). Defendants do not raise the defense now and appear to have abandoned it. In any event, it is without merit.

While the proposition that color itself is not protectible is true as a general matter, plaintiffs here seek to protect more than a mere color. Rather, plaintiffs seek to enjoin the use of packaging that as a whole deceives the consumer as to source. It is not any particular color or feature of the trade dress that plaintiffs seek to protect but rather the manner in which colors and other visual elements are combined and juxtaposed to create an overall appearance. It is the "look" of the product as a whole that plaintiffs seek to protect. *See P.F. Cosmetique, S.A., v. Minnetonka Inc.,* 605 F.Supp. 662 (S.D.N. Y.1985).

er the Knorr trade dress has acquired secondary meaning. I disagree. Trade dress acquires secondary meaning when the consuming public associates it with the source of the particular product rather than the product itself. *See John Wright, Inc. v. Casper Corp.*, 419 F.Supp. 292 (E.D.Pa. 1976), *modified on other grounds*, 587 F.2d 602 (3d Cir.1977). Secondary meaning may be shown in a number of ways. The factors to be considered are: "(1) the length of use, (2) buyer association, (3) extent of sales and advertising, and (4) the fact of copying." *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.*, 685 F.2d 78, 82 (3d Cir.1982). In the instant case, there is no genuine dispute as to each of these four factors.

■ First, defendants do not contest the fact that plaintiffs have utilized the same packaging for some thirty years. Where, as in this case, the trade dress is highly distinctive and non-functional, long and continued use strongly suggests the establishment of secondary meaning. *See* R. Callmann, The Law of Unfair Competition Trademarks and Monopolies, § 19.27 at 89 [hereinafter "Callmann"].

Nor do defendants raise a genuine issue with regard to buyer association. Defendants' suggestion that a significant portion of the buying public does not recognize the "Knorr" name itself is largely irrelevant. It is not the "Knorr" mark, after all, that is the subject of this suit. Defendants candidly admit that no studies have been performed on the source-indicating function of the packaging itself. Moreover, in order to establish secondary meaning, plaintiffs need not show that the public associates their packaging with the Knorr name but, rather, only with some particular source. *See* Callmann, § 19.25, n. 7 at 81 ("[a]lthough it is axiomatic that one who claims secondary meaning 'must show that the primary significance of the term in the minds of the consuming people is not the product but the producer,' this does not mean that the public must in fact know the producer. It suffices if consumers accept

the trademark as an indication of origin and are motivated to buy because of it[ ]"). Defendants' argument serves merely to confuse the issues and does not raise a material factual dispute.

■ As for the third factor, it is likewise clear that no material issue of fact precludes the entry of summary judgment. Defendants' contention that Knorr's sales in the United States are not as strong as plaintiffs suggest in no way undercuts an otherwise uncontroverted showing of secondary meaning. Plaintiffs have shown that Knorr maintains a significant market share in the face of established domestic competition. So long as even a small segment of the public has come to know and identify the Knorr packaging, plaintiffs may show secondary meaning. *See President of Trustees of Colby College v. Colby College—New Hampshire*, 508 F.2d 804 (1st Cir.1975). On the issue of advertising, defendants are correct in pointing out the gaps in plaintiffs' advertising over the years and the failure to emphasize the trade dress itself. Nevertheless, in light of the long and uninterrupted use of the packaging, the significant sales figures, and, as I will discuss next, the fact of actual copying, plaintiffs' failure to focus its ad campaign on its trade dress is not evidence probative enough to delay the entry of summary judgment.

[8] Indeed, the most telling evidence in this case is the simple fact of intentional copying. Taking into consideration Reese's former role as a distributor and its efforts to compete against the established Knorr line, it would be naive to suggest that OSEM happened upon a design that imitates in significant ways the successful Knorr line. Fressie's allusions to "spring-like colors" notwithstanding, defendants do not challenge the fact that they expressly instructed OSEM to copy the Knorr packaging, emphasized the importance of generating a line exactly like the Knorr line in all significant respects, and included samples of the Knorr soup boxes for OSEM's use in formulating the Reese box. This fact of

copying alone is sufficient to establish secondary meaning in a trade dress case. Callmann, § 19.38 at 167; *see Fremont Co. v. ITT Continental Baking Co., Inc.*, 199 U.S.P.Q. 415 (S.D.N.Y.1977); *see also Johnson & Johnson v. Quality Pure*, 484 F.Supp. 975 (D.N.J.1979).

▬▬▬▬ Finally, plaintiffs must show a likelihood of confusion. Defendants argue, relying primarily on the absence of evidence of actual confusion, that summary judgment on this issue is premature. This argument is without merit. Initially, it should be noted that in this circuit the issue of likelihood of confusion is one of law and not fact.[7] Burton, Summary Judgment in Trademark Cases, 75 Trademark Rep. 497 (1985); *see Sears, Roebuck & Co. v. Johnson*, 219 F.2d 590 (3d Cir.1955); *A. Smith Bowman & Sons, Inc. v. Schenley Distillers, Inc.*, 190 F.Supp. 586 (D.Del.1961). This issue is, therefore, ripe for summary disposition.

The test most commonly utilized in determining the potential for confusion in trademark cases is that found in *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225 (3d Cir.1978). There are ten factors in the *Scott Paper* test:

(1) the degree of similarity between the marks (or trade dress);

(2) the strength of the mark;

(3) the price of the goods and other factors which suggests the care a consumer might take in making the purchase;

(4) the length of time the mark has been in use;

(5) the defendant's intent in adopting the mark;

(6) any evidence of actual confusion;

(7) whether the goods travel in the same channels of trade;

(8) the extent the parties target the same customers;

(9) similarity of function in the mind of the public; and

(10) other factors that suggest that the public would expect the plaintiff to manufacture a similar product.

*Id.* at 1229.

Because *Scott Paper* is a case of trademark infringement and not one of trade dress unfair competition, not all of the factors would apply. For example, the last two factors involve situations of conflict between different products using the same mark, unlike the instant case which involves the same product, and hence those factors are not applicable here. Be that as it may, the essence of trade dress is to function as a trademark. Moreover, the *Scott Paper* test serves the same function in either a trade dress or trademark case; namely, whether or not the public will be confused as to the allegedly infringing product's source. *Compare Freixenet*, 731 F.2d at 148 ("dispositive issue is ... possibility of consumer confusion as to source") *with Scott Paper*, 589 F.2d at 1229 (likelihood of confusion exists when consumer assumes infringing mark is associated with plaintiff's mark). Applying the factors of the test here, I am convinced that plaintiffs have shown a likelihood of confusion.

Obviously, the threshold issue is the similarity between the marks. In comparing the degree to which trade dresses are similar, it is important to remember that the test is not mechanically quantitative. Rather, in such a case the test to be applied is whether after looking at the visual similarity of the packages when viewed as a whole, and not by attention to individual features, one is left with the impression

---

**7.** Even if the issue were one of fact and not law, defendants have failed to present evidence raising a material issue of fact. The mere absence of proof of actual confusion, given the insignificance of this factor as defined by the governing law, and in light of the overwhelming weight of the other factors in plaintiffs' favor, does not create a genuine issue of fact. *See Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511 (evidence which is "merely colorable or not significantly probative" will not preclude summary judgment).

that a consumer would not be able to distinguish a defendant's product from a plaintiff's product if he or she saw the latter alone. *P.F. Cosmetique, S.A. v. Minnetonka Inc.*, 605 F.Supp. 662 (S.D.N. Y.1985).

In the case at bar, I have carefully compared the two cartons and, while the decision is admittedly subjective, I am of the opinion that the two seek to project the same "look." Without listing or focusing on individual similarities, it is clear that each carton splits the panel into two sections, the upper portion of which highlights the company's name in red script against the same bold yellow background. Similarly, the bottom half emphasizes the color green as a border framing a prepared bowl of soup embellished with the raw ingredients. On the whole, I am convinced that a customer, familiar with plaintiffs' goods, seeing one of defendants' packages alone could confuse it with plaintiffs'. *Cf. P.F. Cosmetique, S.A.*, 605 F.Supp. at 669. In fact, in virtually every detail, the Reese soup carton is substantially similar to, or exactly the same as, the Knorr package.

Having determined the high degree of similarity between the competing packages, it is clear that all the other factors, except one, support the conclusion of a likelihood of confusion. First, the mark is a particularly "strong" one; that is, it is much more distinctive than it is descriptive or functional. It is uncontroverted that until Reese put out its own line of dried soups, Knorr was the only company utilizing the yellow, green and red motif featured throughout the Knorr line. Moreover, because the mark in this case is trade dress and hence decorative in function, it is by its very nature a strong mark.

Second, at least two factors suggest that a customer might use less care in selecting a box of dried soup than he or she might in selecting some other product. First, the price of the product—under two dollars—relegates it to the category of a relatively minor purchase. Moreover, the product is often purchased quickly as one selection among many others made during a typical excursion to a modern supermarket.

The fourth and fifth *Scott Paper* factors have already been discussed at length. The use of the Knorr trade dress for decades has been noted as well as the overwhelming evidence of an intention to copy.

Finally, there is no dispute between the parties that the Knorr and Reese lines travel in virtually identical channels of trade, often through the same distributors and retail stores, and that the goods compete for customers seeking a high-grade of imported dried soup and recipe mix.

The only issue that does not weigh heavily in plaintiffs' favor is the issue of actual confusion. Plaintiffs have offered no evidence of complaints by consumers or other proofs of deception. That failure need not, however, preclude summary judgment in this case. It is axiomatic that a plaintiff need not show actual confusion in order to succeed on a claim of infringement. Only a showing of the likelihood of confusion is required. *U.S. Jaycees v. Philadelphia Jaycees*, 639 F.2d 134 (3d Cir. 1981). Moreover, there are several factors, including the relatively low cost of the product and the poor sales of the Reese product, which would reduce the likelihood of consumer complaints.

In sum, plaintiffs have established that there are no material issues of fact and that they are entitled to summary judgment as a matter of law on each of the elements of trade dress infringement.

Only the issue of damages and the propriety of an award of attorneys' fees remain. Plaintiffs initially sought 1) an award of the profits earned by defendants from defendants' sale of Reese soups in the confusingly similar packaging together with an increase in that award "as the court shall find to be just", 15 U.S.C. § 1117; and 2) an award of attorneys' fees in this "exceptional" case, *id.* Apparently in recognition of the fact that defendants' profits, even with the statutory increase,

would prove to be relatively minimal, and that the expenditure of time, effort, and money involved in the accounting and further discovery which would be necessary before that figure could be determined, plaintiffs have withdrawn their claim for profits and press only their claim for attorneys' fees.[8]

Section 35 of the Lanham Act, 15 U.S.C. § 1117, authorizes the award of reasonable attorneys' fees in "exceptional" cases of infringement of registered trademarks. Preliminarily, I must consider, as courts are increasingly considering, whether § 35 permits the award of attorneys' fees in an infringement action involving an unregistered trademark. Certainly, the circuits that have decided the question have held that § 35 applies to § 43(a), despite the apparent limitations in the language of § 35. *See Hartman v. Hallmark Cards, Inc.*, 833 F.2d 117, 123 (8th Cir.1987); *Brunswick Corp. v. Spinit Reel Co.*, 832 F.2d 513, 528 (10th Cir.1987) ("[a]lthough these decisions completely ignore strict construction of the Lanham Act and are a wholesale judicial creation of remedies that Congress has not expressly provided for, we are not inclined to create a split in the circuit courts...."); *Centaur Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1229 (2d Cir.1987); *WSM, Inc. v. Wheeler Media Services, Inc.*, 810 F.2d 113, 116 (6th Cir.1987); *Transgo, Inc. v. AJAC Transmission Parts Corp.*, 768 F.2d 1001, 1025–27 (9th Cir.1985), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986); *Rickard v. Auto Publisher, Inc.*, 735 F.2d 450, 453–58 (11th Cir.1984). The Third Circuit has refrained, in one case, from deciding the question, *Standard Terry Mills, Inc. v.*

*Shen Mfg. Co.*, 803 F.2d 778, 781–82 (3d Cir.1986), and, in another case, assumed without holding that § 35 applies to common law trademark actions brought under the Lanham Act, *Donsco, Inc. v. Casper Corp.*, 587 F.2d 602, 608 (3d Cir.1978). As the Third Circuit observed in *Standard Terry Mills*, "the motivation behind this judicial gloss is the realization that the federal courts would face the undesirable prospect of creating a common law remedy for § 43(a) rights were they to hold that § 35's remedies did not apply in common law trademark infringement suits." 803 F.2d at 782.[9]

The extension of § 35's remedial scheme to a § 43(a) action is, in my view, consistent with Congress' underlying goals in passing the Lanham Act. *See Rickard*, 735 F.2d at 457. Beyond that, the thusfar unanimous view of the circuits which have decided the issue counsel that I reach the same conclusion, and I do.

Is this, therefore, an "exceptional case" justifying the award of attorneys' fees? Without question, it is. Deliberate and willful infringement can render a case "exceptional" and, thus, support an award of attorneys' fees. *Centaur Communications, Ltd.*, 830 F.2d at 1229. Stated somewhat differently, attorneys' fees can be awarded to the successful party on a finding that the wrongdoer's acts of infringement can fairly be said to be malicious, fraudulent, willful or deliberate. *Brunswick Corp.*, 832 F.2d at 528. *See also Hairline Creations, Inc. v. Kefalas*, 664 F.2d 652, 657–58 (7th Cir.1981).

The powerful evidence of a willful and deliberate copying of the Knorr package

---

**8.** Plaintiffs also sought "sanctions", particularly because of what they correctly describe as defendants' "disregard for the court and its orders". Because it became clear at oral argument that neither application of Rule 11 nor 28 U.S.C. § 1927 would be appropriate as a sanction for the conduct which deserves condemnation in this case and that contempt, while certainly more appropriate, would presumably occasion more litigation, plaintiffs do not press their request for sanctions.

**9.** Were the Third Circuit to hold that § 35's remedies do not apply here, plaintiffs could recover attorneys' fees under New Jersey law on their common law unfair competition action. *See Red Devil Tools v. Tip Top Brush Co., Inc.*, 50 N.J. 563, 575–76, 236 A.2d 861 (1967); *Salton, Inc. v. Cornwall Corp.*, 477 F.Supp. 975, 992–93 (D.N.J.1979).

design is alone sufficient to render this case "exceptional" and support an award of fees. But there is more, including but not limited to 1) the sale at discount of all of defendants' inventory to distributors during the week that decision on the preliminary injunction was under advisement and with knowledge that the court believed the package design to be infringing; and 2) the continued shipment of soup in the infringing packages and the failure to commence the recall of soup that had been shipped during that one week hiatus until one day before the recall was to have been completed, the latter presumably to buy more time within which the distributors could dispose of the soup and both in spite of the oral order of the court or, as defendants put it, because the oral order of the court was not yet reduced to writing and signed. Plaintiffs are to submit an affidavit of services within ten days of the date of this order and "reasonable" attorneys' fees will be awarded.

In sum, plaintiff's motion for summary judgment and attorneys' fees will be granted and defendants will be permanently enjoined from further use of the infringing packages. An appropriate order will issue.

### ORDER

This matter having been opened to the Court by plaintiffs by notice of motion for summary judgment and defendants having filed opposition thereto; and the Court having considered the submissions of the parties and the arguments of counsel; and the Court having rendered an opinion on the date hereof and for the reasons expressed therein;

IT IS on this 27th day of September, 1988

ORDERED that plaintiffs' motion for summary judgment and permanent injunctive relief be, and the same hereby is, granted; and it is further

ORDERED that plaintiffs' motion for attorney's fees pursuant to 15 U.S.C. § 1117 be, and the same hereby is, granted; and it is further

ORDERED that plaintiffs submit an affidavit of services within ten (10) days of the entry of this order; and it is further

ORDERED that plaintiffs submit a proposed form of order for a permanent injunction pursuant to N.J.Dist.Ct.Gen.R. 22(B) specifying, in conformity with *American Greetings Corp. v. Dan–Dee Imports, Inc.*, 807 F.2d 1136, 1146–49 (3d Cir.1986), the precise articles of packaging enjoined.