**REGAL JEWELRY CO., INC., Plaintiff,**

**v.**

**KINGSBRIDGE INTERNATIONAL, INC., and Revco D.S., Inc., Defendants.**

No. 95 Civ. 10628(BN).

United States District Court,
S.D. New York.

March 23, 1998.

---

Howard F. Mandelbaum, Levine & Mandelbaum, New York City, for Plaintiff.

Edward R. Schwartz, Christie, Parker & Hale, LLP, Pasadena, CA, for Defendants.

## OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

NEWMAN, Senior District Judge.[1]

Regal Jewelry Co., Inc. ("plaintiff" or "Regal") brings this action against defendants, Kingsbridge International, Inc. ("Kingsbridge") and Revco D.S., Inc. ("Revco"), for allegedly infringing upon an uncopyrighted "family" trade dress which Regal uses when packaging inexpensive novelty items such as manicure sets, key chains and credit card holders.

Plaintiff claims that the trade dress it uses for its line of products was infringed in violation of section 43(a) of the Lanham Act. 15 U.S.C. § 1125(a). Regal also brings suit under New York State law for unfair competition and dilution of distinctive trade dress. For a remedy, Regal requests an accounting of Kingsbridge and Revco's profits, treble damages, destruction of all misrepresented and infringing goods, an injunction enjoining Kingsbridge and Revco from selling or advertising the six specific products involved in this suit as well as any other products that have a false designation of origin or which infringe upon or dilute Regal's "theme" or

---

**1.** Bernard Newman, Senior Judge of the United States Court of International Trade, sitting as United States District Judge by designation.

"family" trade dress, and an award of costs and attorneys fees.

Conversely, defendants maintain that while they sell essentially the same products, they did not intentionally copy Regal's trade dress. In addition, defendants argue that even if Regal's packaging had been copied, it is not protectable because it is generic, has not developed secondary meaning, and is merely functional.

This court has jurisdiction over all claims in this dispute pursuant to 28 U.S.C. § 1338 and 15 U.S.C. § 1121(a). The case was tried to the court in a three day bench trial. In conformity with Rule 52(a) of the F.R.C.P., the following constitutes the court's findings of fact and conclusions of law.

## THE RECORD

In its direct case, plaintiffs presented four witnesses: Leslie Eysler, owner and president of Regal; Edward Gangi, vice president and general manager of Regal; Robert Sommer, a vice president of Kingsbridge; and Paul Foster, owner and president of Kingsbridge.

Defendants presented two witnesses, Robert Sommer and Paul Foster of Kingsbridge.

In addition, the parties moved 181 exhibits into evidence, including the transcript of a deposition of Steven Moss, formerly a senior buyer for Revco.

## CONTENTIONS OF THE PARTIES

Plaintiff contends that it developed and used a distinctive style of packaging for novelty items consisting of a rectangular gray box "sometimes with a bluish or greenish tint" with a photo of the product on the two largest sides framed by a white line and the generic name of the product printed above the photo in white type, with copy describing the features or uses of the product on the smaller side panels of the box. According to plaintiff, in 1994 Revco Drug Stores requested samples of Regal's products and their packaging in order to copy the packages and sell the same products in the copied packages

to consumers as if they had been supplied by Regal. In 1995, Revco sent some of Regal's samples to Kingsbridge with the instruction to provide the products and packaging to Revco at a lower cost. Regal argues that because its packaging was copied, it is entitled to lost profits, treble damages and further relief.[2]

Defendants respond that they did not copy Regal's trade dress, that the packaging Regal uses is not protectable under federal law because it is not consistently defined by Regal, and that the trade dress as it is described in the complaint is not distinctive, causing any alleged state law protections to be preempted. Defendants further assert, that even if Regal's packaging is distinctive, the packaging features at issue are cost-saving functional features which cannot be protected. In addition, defendants contend that no damages should be awarded to Regal even if Regal's packaging is protectable.

## FINDINGS OF FACT

Regal Jewelry, a New York Corporation, is an importer and distributor of gift and novelty items. Within its line of approximately 200 various products, six are at the center of this suit. Those items are a "Manicure Set" (a nail trimmer and file kit), a "Solid Brass Tire Gauge/Key Ring" (a key ring attached to a small tire gauge by a chain), a "Leather 3 in 1 Case" (a leather case for carrying coins, keys, etc.), a "Booklight" (a portable battery-powered lamp with a clip for mounting on a book), a "Precision Screwdriver Set" (a set of small screwdrivers in a plastic case) and a "Genuine Leather Card Holder" (a credit card case). The six listed items are common market goods, almost all of which can be obtained from any number of manufacturers. According to Eysler, the exception, the Tire Gauge/Key Ring, is only produced by one manufacturer.

In 1990, Regal began packaging its products in a "family" or "theme" trade dress. However, the precise characteristics of this trade dress are not clear because Regal has

---

2. Regal does not contend, however, that the photographs it uses on its boxes were infringed or that the goods it sells were impermissibly copied.

articulated several different trade dresses as if they are one:

1) At trial, Eysler, who has worked for Regal since 1981 and is now president, explained that the theme trade dress involves the use of a "gray teal blue" background color on a box with a photograph of the product framed by a white line. The photograph normally overlaps the white line so that it looks like the item in the picture is not completely framed by the line. In addition, a name for the product appears at the top of the photograph.

2) Edward Gangi, the vice-president and general manager of Regal, asserted that the theme packaging includes boxes that display the Regal logo, use the Regal theme color, which he described as "gray," and have a similar typeset on the box for the name of the product.[3] While Gangi considers the white line around the photo to be part of "the basic theme package," he explained that the line was not a necessary feature of Regal's trade dress.

3) In the complaint, the joint pre-trial order and the post-trial briefs, Regal alleged that its trade dress consists of rectangular boxes having a uniform appearance in that they are gray (sometimes with a greenish or bluish tint), with a color photograph of the product contained therein on the front and back, a white line framing the photograph, the name of the product printed in white typescript above the photo and frame, and white block lettering on the tinted panels on the smaller side and end panels of the box.[4]

Regardless of its precise elements, Regal's theme color trade dress was first designed for several products in 1990 by Eysler and her father-in-law, Nick Maio of Maio Associates, Inc.. According to Eysler, as new orders for products were placed over the years, the items were ordered in newly-designed theme packaging. By the time of the alleged

infringement in 1995, Eysler claims that approximately half of Regal's products displayed Regal's theme trade dress. However, the remainder of its products, including four of the products in this suit, the Leather 3 in 1 Case, the Precision Screwdriver Set, the Solid Brass Tire Gauge/Key Ring and the Booklight did not conform to Eysler's version of Regal's trade dress. Further, the court does not accept Eysler's testimony as completely accurate. Not only did Eysler's demeanor on the witness stand suggest that she was extremely evasive when being questioned about the features that made up her company's trade dress, but at least one package in suit appears to have been re-packaged after 1990 in a style that deviates from her version of the trade dress. During Eysler's testimony she referred to a catalog of Regal's products which she said was published in 1993 (Exhibit 33). Regal's Leather 3 in 1 Case appears at the bottom of the sixth page of that catalog in a tan box. That product is no longer sold in a tan box, but its present packaging does deviate from Eysler's version of the trade dress. These differences will be discussed shortly.

Upon examination of the six packages in suit; the boxes for the Manicure Set and the Genuine Leather Card Holder comport with Eysler's definition of the theme trade dress.[5] However, the other four products which Regal claims were copied are in packages that deviate from either Eysler's or the briefed trade dress in a number of ways:

*The 3 in 1 Case*

The photo on the front and back of the box for the 3 in 1 Case covers the entire panel. Eysler referred to this feature as a "full bleed." The photos are not framed by a white line and the name of the product is printed at the top of the front and back panel in black typescript instead of white. The Regal theme color also does not appear as a

---

3. Gangi has worked in the novelty item industry for over twenty-one years.

4. Although Eysler testified that Regal's boxes do not have a front or back, for purposes of description, this opinion will refer to the two largest panels of each cardboard box as the "front" and "back" even though the two panels are usually identical. The "end" panels will refer to the

smallest sides of the box, which happen to open, and the "side" panels will refer to the two panels which share the longest edge of the front and back panels of the box.

5. All six of the Regal packages in suit, in accord with Gangi's version of the trade dress, display an oval-shaped Regal logo on the front and back panels.

background color on the panels of the box that display the photos, but the theme color is used on the smaller side and end panels of the box.

### The Precision Screwdriver Set

The packaging for Regal's Precision Screwdriver Set strays from all of the alleged trade dresses. A photo of the set appears on the front and back panels of the box and that photo is also a "full bleed" in that it covers the entire panel. The background color on the box varies from white to a purple or magenta color. As a result, the background at the very top of the picture is purple and it fades as the eye moves down the picture so that the background at the bottom edge of the picture is a plain white. The narrow side panels of the box fade from purple to white from top to bottom in the same manner as the front and back. The end panel on the top of the box is solid purple, like the top of the front, back and side panels, while the bottom end panel is white, like the bottom of the front, back and side panels. The teal gray theme color appears nowhere on the box and there is no white line framing the photos of the screwdriver set. The name of the product, however, does appear in white typescript at the top of the box on both the front and back panels and features of the product are described in white lettering on the narrow side panels.

### The Solid Brass Tire Gauge/Key Ring

Regal's Solid Brass Tire Gauge/Key Ring, which fits all three of Regal's claimed trade dresses except that the gray background color is light gray instead of Regal's dark teal gray theme color. Eysler testified that the boxes were supposed to be made in the Regal theme color and that she received a "charge back" from the maker of the box. Nevertheless, Regal still used the packaging to sell the key ring.

### The Booklight

The Booklight comports with Gangi's version and the briefed version of the trade dress, but differs from Eysler's version in that the photos on the front and back of the box do not overlap the white line that frames them.

With these products and other, Eysler and Gangi approached Steven Moss, a senior buyer at Revco, in March of 1992, hoping to provide Revco with "stocking stuffer" types of gifts for the 1992 Christmas season.[6] Over several months, Regal sent correspondence to Moss and forwarded samples of the products and packaging that Regal hoped to provide.[7] In one of these letters, Eysler claimed that Regal's packaging was copyrighted. However, at trial Regal did not present any proof to support this statement and Eysler stated that she actually did not know if the design of Regal's current packages had ever been copyrighted. While Regal did produce evidence that some of its earlier package designs had been copyrighted,[8] in the absence of any evidence supporting the claim made in the letter, this court finds that no copyrights exist for any of the different designs that Regal has designated as its theme trade dress.

Eventually, Eysler had a face-to-face meeting with Moss at his office. At the beginning of the meeting, Moss and Eysler filled out and signed a "check" printed on a rubber strip as a joke. Moss told Eysler that the rubber check was the fastest way that Regal could get paid by Revco. Revco did not place an order with Revco after this meeting.

In March and April of 1994, Regal tried to persuade Moss to purchase goods for the 1994 Christmas season. During these discussions Moss requested samples from Regal which were sent to Revco, but again, no agreement was ever reached.

6. Defendant, Revco D.S., Inc., a Delaware corporation, is a retailer engaged in the operation, throughout much of the United States, of a chain of approximately 2,700 drug stores which sell gift and novelty items including the products normally contained in the packaging involved in the present suit. According to Eysler, when Regal began "chasing" Revco as a client, it had 1,100 stores that Regal hoped to supply.

7. Moss has worked for drug stores in managerial and other positions for over twenty years.

8. The registrations are for packages for a "TIRE GAUGE—KEY RING," a "MANICURE SET" and a "GENUINE LEATHER CARD HOLDER." Exhs. 27, 29, 31.

In December of 1994, Regal approached Moss for a third time in the hopes of persuading him to buy products for Revco to be sold in the 1995 Christmas season. During these discussions, Regal sent samples of items it recommended to Moss. In March of 1995, Moss told Regal that Revco was not able to use its products but that Regal's information would be kept on file for the following year.

At approximately the same time, Moss contacted other companies to ascertain if he could find products similar to Regal's at a lower price. Trying to find the least expensive supplier was a common practice for Moss; and one of the companies he contacted and had worked with in the past was Kingsbridge International ("Kingsbridge").[9] Moss told Paul Foster, president of Kingsbridge, for which items he wanted price quotations.[10] Moss also said that the items would need to be in gray boxes and that Revco would need to be able to return all unsold merchandise to Kingsbridge for a complete refund. Moss made it clear that the refund had been promised to Revco by another company.[11] In a deposition before trial, Moss also explained that gray is a commonly used color for packaging novelty items that are supposed to be sold to both men and women and which are not intended to be sold as a seasonal item, unlike green packaging at Christmas time or red packaging around Valentine's Day.

Foster then either telephoned or sent a fax to Robert Sommer, a vice president at Kingsbridge, who was on one of many frequent business trips to Asia.[12] Sommer was able to relay quotes back to Foster and after Kingsbridge received a commitment from Revco, Sommer ordered the merchandise from suppliers in Asia on April 2 and 3, 1995. For both Foster and Sommer, these events were a common business transaction involving only several of the three to four thousand different items which Kingsbridge carries.

Prior to placing the orders for Revco, Sommer had seen a sample of Regal's claimed trade dress in a manufacturer's showroom in Asia. On the purchase order that he sent to the supplier of Kingsbridge's manicure set, Sommer wrote that he wanted each set packaged in a "PANTONE 430C GRAY BOX LIKE REGAL'S; WHITE COPY."[13] Sommer explained that this direction was designed to make the supplier use a gray box. The manufacturer had already shown a sample to Sommer in a pink box. Sommer testified that he sent his directions for "Pantone 430C" because that is a designation on a particular color chart that is commonly used throughout the industry. However, the price the manufacturer had quoted to Foster did not include a box with a color that is mixed with the precision of a Pantone color. Sommer used these additional designations referring to Pantone colors and to Regal's box because he often has some difficulty communicating accurately with some manufacturers in Asia. Often, Sommer and the people with whom he places orders are not completely fluent in the same language. Sommer also asserted that he never received any samples of Regal's trade dress while he was placing the orders for the products and packaging. After having the opportunity to observe Sommer and to hear his testimony, this court finds his testimony to be credible and reliable.

Subsequently, Revco prepared a flier to advertise a wide range of gifts it was selling for the 1995 Christmas season. At least one Regal product, packaged in the trade dress described in Regal's complaint and with Regal's logo appearing on the box, was placed in this nationally-circulated ad. Moss did not know why the Regal box was placed in the ad and he assumed its use was inadvertent.

9. Defendant, Kingsbridge International, Inc., is a California corporation and is an importer and distributor of gift and novelty items.

10. Foster has worked either at drug stores or selling novelty items for forty-three years.

11. In fact, this promise had been a prominent part of Regal's "sales pitch" since 1992.

12. Foster has worked in the industry since 1982.

13. Sommer also testified that in the novelty item industry gray is normally a color that is used on boxes for products that are marketed for both men and women, as opposed to pink boxes which are usually used for gifts that are marketed for women.

Eventually, the products which Kingsbridge imported for Revco were sold and on shelves in Revco Drug Stores. In November of 1995, Gangi saw the items in a Revco store in Staten Island. Initially, he thought the products must have come from Regal. However, Gangi recalled that Regal had not received any orders from Revco and upon closer inspection of the packaging observed that the products were from Kingsbridge, a company which Gangi had never heard of prior to that time. Immediately, Gangi purchased each of the six items in this suit except for the Genuine Leather Credit Card Holder. On December 1, 1995, Eysler purchased all six of the Kingsbridge items in suit at a Revco store in Comack, New York.

All of the Kingsbridge boxes were light gray rectangular boxes having on their largest panels a color photograph of the product contained therein; with the photograph being surrounded by a white rectangular line; and the name of the product printed above the frame in a white typeset; and further descriptive material printed in white block lettering on the side and ends of the boxes. The Kingsbridge boxes also have a cardboard tab at the top from which they can be hung.[14] Each box also bears Kingsbridge's name, although not in the form of a logo and not on the front or back panels of the box.

According to the testimony at trial, these box design features are extremely common and inexpensive in the novelty item industry. In point of fact, Sommer and Moss stated that when they saw Regal's packaging they believed it was a "maker's box"—a box that the manufacturer often provides at no additional expense to the retailer. "Maker's boxes" typically have a background color that covers most of the box and a photograph with the name of the product on the box. Many of these boxes have some copy on the box and a line or some other type of graphic is often used to draw the customer's attention to the picture. In addition, the cost of

packaging is especially significant because the parties agreed that consumers are extremely price sensitive when purchasing novelty items. The court finds Sommer's testimony about commonly used features on "maker's boxes" to be credible. Sommer, Foster and Moss claimed that during their years of experience they had often seen boxes with similar combinations of these simple features used to inexpensively package novelty items. Because Sommer believed that Regal's boxes were standard "maker's boxes," he was not concerned about how closely Kingsbridge's manufacturer's copied Regal's packaging when he placed the order for Revco.

Based on this testimony, the court finds that the features used on Regal's boxes are common, inexpensive design features which appear in similar combinations on many novelty item boxes. This believable testimony was additionally corroborated by numerous exhibits introduced by the defense and during the plaintiff's rebuttal case. Many of these exhibits are boxes for various novelty items that employ, in different combinations, features such as photographs of the product, lines around photos or copy, a single background color for the parts of the box that are not covered by the photo, and white typescript identifying the product above the photo, and typescript or block lettering describing the product elsewhere on the box. While no single exhibit was quite as similar to Regal's theme trade dress as the Kingsbridge items in suit, many boxes shared several characteristics with Regal's boxes.

Before the end of 1995, Regal filed suit against Kingsbridge and Revco. By reason of this suit, Kingsbridge recalled all of the unsold items in the disputed packaging and re-distributed the products in new boxes.

## CONCLUSIONS OF LAW[15]

Regal raises several claims: that its trade dress was infringed under federal law; that

---

14. Three of Kingsbridge's boxes also differ from the design it used. The Precision Screwdriver Set has a plain light gray back panel. There is no picture, line or copy on the back. The Manicure Set uses block lettering for the name of the product above the photo and the copy on the sides of the box is in italics instead of block lettering. The Manicure set is also the only

Kingsbridge product in which the picture of the product overlaps the white line bordering the photograph. Finally, the Tire Gauge/Key Ring box does not have a cardboard tab on the top.

15. Any conclusion contained within this section that constitutes a factual determination should be deemed a finding of fact.

its trade dress was infringed under state law; that its trade dress was diluted; and that damages should be calculated in a particular manner and awarded to the plaintiff. Regal also asserts that defendants should be enjoined from using similar packaging in the future.

### The Lanham Act Claim

■ The purpose of unfair competition law, and the Lanham Act, is to protect the goodwill that businesses create in their name or identity, and to protect consumers from deceit relating to the sources of their purchases. *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 112 S.Ct. 2753, 2757, 120 L.Ed.2d 615 (1992); *Landscape Forms, Inc. v. Columbia Cascade Co.*, 113 F.3d 373, 375 (2d Cir.1997); *Fabrication Enterprises, Inc. v. Hygenic Corporation*, 64 F.3d 53, 57 (2d Cir.1995). Toward this goal, section 43(a) of the Lanham Act provides a private cause of action against any person who

> in connection with any goods ... or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person ...

15 U.S.C. § 1125(a). This section applies to the overall image of a product's packaging, including labels, wrappers and containers used on a product, *Forschner Group, Inc. v. Arrow Trading Co.*, 124 F.3d 402, 407 (2d Cir.1997); *Fun–Damental Too, Ltd. v. Gemmy Industries Corp.*, 111 F.3d 993, 999 (2d Cir.1997), *quoting*, Restatement (Third) of Unfair Competition § 16, cmt. A (1995), and can protect the trade dress of entire families of products. *See Landscape Forms*, 113 F.3d at 380–381; *Harlequin Enters., Ltd. v. Gulf & Western Corp.*, 644 F.2d 946, 948 (2d Cir.1981); *Jeffrey Milstein, Inc. v. Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 31 (2d Cir. 1995). Of course, if a plaintiff is able to demonstrate a consistent trade dress covering its products, a plaintiff must then show 1) that its trade dress is distinctive and 2) that

a likelihood of confusion exists between its products and the defendant's products. *Two Pesos*, 112 S.Ct. at 2758; *Fun–Damental Too*, 111 F.3d at 999.[16]

■ However, family trade dress protection for a line of products places a significant challenge before a plaintiff who must show "that the appearance of its several products is sufficiently distinct and unique to merit protection as a recognizable trade dress." *Landscape Forms*, 113 F.3d at 380–381; *Jeffrey Milstein*, 58 F.3d at 31–33; *Casa Editrice Bonechi, S.R.L. v. Irving Weisdorf & Co., Ltd.*, 1997 WL 749388 (S.D.N.Y.1997); *Walt Disney Company v. Goodtimes Home Video Corp.*, 830 F.Supp. 762, 766 (S.D.N.Y.1993); *see also Chevron Chemical Co. v. Voluntary Purchasing Groups, Inc.*, 659 F.2d 695, 703 (5th Cir. 1981). Initially, this burden requires the plaintiff to articulate a specific trade dress, *Landscape Forms*, 113 F.3d at 380–382, and then to demonstrate that it has, in fact, consistently used that trade dress. *See e.g., Life Industries Corp. v. Star Brite Distributing, Inc.*, 31 F.3d 42, 46, 50 figure 3 (2d Cir.1994); *Clinique Laboratories, Inc. v. Dep Corp.*, 945 F.Supp. 547, 559 (S.D.N.Y.1996); *Walt Disney*, 830 F.Supp. at 767–768. In addition, courts consider these broader product line claims with an "acute" concern for protecting competition given that any remedy could potentially cover a wide range of products. *Landscape Forms*, 113 F.3d at 380–381, *citing, Wallace Int'l. Silversmiths, Inc. v. Godinger Silver Art Co.*, 916 F.2d 76, 81–82 (2d Cir.1990). Ultimately, Regal's Lanham Act claim fails because it has not consistently defined the elements of, or pursued the use of, a theme trade dress.

According to Regal's complaint and posttrial briefs, it seeks federal protection for a rectangular gray box (sometimes with a bluish or greenish tint) with a photo of the product on the two largest sides framed by a white line and the generic name of the product printed above the photo in white type with copy describing the features or uses of the product on the smaller side panels of the

---

**16.** The Lanham Act protects distinctive trademarks and trade dress and does not distinguish

between them. *Two Pesos*, 112 S.Ct. at 2760.

box. However, Regal's witnesses never gave such an account of its trade dress. Eysler, the president of Regal and the co-designer of its theme trade dress, considers the trade dress to encompass boxes that are a more specific "gray teal blue" with a photograph that overlaps a white frame and with the name of the product appearing above the photo. Notably, this description does not require the name of the product to be in white typescript and does not require descriptive copy to be written elsewhere on the box. Gangi, on the other hand, stated that Regal's theme packaging includes boxes that are "gray," have a similar typescript and display the Regal logo. Thus, this least restrictive definition would pertain to a very broad category of packaging.[17] The diverging opinions put forth by plaintiff regarding the limits of its own trade dress undermine its burden to articulate an identifiable trade dress deserving of blanket protection.

Nevertheless, the determination regarding infringement does not necessarily turn on the ability of plaintiff's witnesses to parrot the factors of the trade dress alleged in the complaint and the pre-trial order. Indeed, Regal has not shown that it has consistently applied any single avowed theme trade dress to the packages of its products.

For instance, in considering only the six products Regal products in the present suit, both the Precision Screwdriver Set and the Leather 3 in 1 Case obviously do not comport with Eysler's version of the trade dress.[18] No shade of gray, let alone plaintiff's theme color, appears on the box. Further, the background colors for the screwdriver set change from purple to white, depending on which portion of the box is being viewed.

Furthermore, while the Leather 3 in 1 Case bears some resemblance to the other packages by having the dark teal gray theme color on its side panels, the photographs of the product cover the entire front and back panels in a "full bleed." Consequently, there is no theme color background on these panels and there is no white line surrounding the photo.

However, the box for the 3 in 1 Case is especially telling regarding the diligence Regal has used in applying its trade dress.[19] The president of Regal testified that since 1990 the company has been phasing in the use of its theme packaging as it ordered more goods. Of the approximately 200 products that Regal sells, about half have been converted to the new packaging. According to Eysler, the Regal Company Gift Catalog was first printed in 1993, three years after Regal began converting its packages to the theme trade dress.[20] At trial, the package for the 3 in 1 Case was referred to by defendants as an exhibit that does not conform to Regal's alleged trade dress because it does not have a white line surrounding the photo on the front and back panels; the theme color is not a background color on the front and back panels; and the generic name of the product is printed in black letters instead of white.[21] However, the side panels for the box pictured in the catalog are brown and are obviously a very different color than the theme color. Accordingly, it appears that some time after 1993, when Regal began publishing the catalog, Regal redesigned the box for the 3 in 1 case in a manner that does not follow the trade dress it now wants to "protect."

---

**17.** Kingsbridge is not accused of copying Regal's logo.

**18.** Because Eysler is the president of Regal and the co-designer of the theme trade dress, the court considers her version to be the most appropriate for comparison and analysis.

**19.** The packaging of the 3 in 1 case is both plaintiff's exhibit 3 and another version of the same package appears at the bottom of the sixth page of plaintiff's exhibit 33, the Regal Company Gift Catalog.

**20.** The catalog does portray many of Regal's products in theme packages on both the front and back covers.

**21.** Of course, the box does conform with the less restrictive version of the trade dress that was proposed by Gangi. However, given that plaintiff did not argue, either at trial or in its post-trial brief, that the more detailed version of the trade dress outlined in the complaint and the joint pretrial order should be forsaken in light of Eysler and Gangi's testimony, it is understandable that defendants' counsel referred to the packaging of the 3 in 1 case as a design that does not conform to Regal's trade dress.

However, Gangi considers the 3 in 1 Case's package to be within Regal's theme trade dress because it does use its theme color. Yet, Regal has neither argued nor submitted evidence to prove that its theme color has acquired secondary meaning in the marketplace. *See generally, Qualitex Co. v. Jacobson Products, Inc.,* 514 U.S. 159, 115 S.Ct. 1300, 131 L.Ed.2d 248 (1995). Consequently, Gangi's expansive opinion regarding Regal's trade dress further blurs Regal's asserted commitment to an identifiable packaging theme and emphasizes a color which Kingsbridge did not use.

In addition to the two items that graphically depart from Regal's alleged trade dress, there is another problem with the dress as Regal has defined it. At trial, Regal's officers referred to a particular teal gray color as "Regal's theme color." Of course, a specific color can be protected as trade dress. *Qualitex,* 514 U.S. 159, 115 S.Ct. 1300, 1304, 131 L.Ed.2d 248; *Forschner,* 124 F.3d at 408. While several witnesses had difficulty using words to precisely describe Regal's theme color, it was clear to the court that regardless of the words used, Regal's theme color was accurately described as a "gray teal blue" by Eysler. Although that theme color was also called "gray" during the course of the trial, Regal's theme color is clearly different from the light gray color that is used on Kingsbridge's boxes. However, Regal's brief argues that varying shades of gray are within plaintiff's trade dress. Thus, Regal would prevent other manufacturers from using many shades of gray as a background color for their packaging. This position does not withstand the acute scrutiny that is required when a plaintiff tries to protect entire families of products.

Regal's departures from a single trade dress and the differences in Regal's theme color from the light gray used by Kingsbridge are especially important when comparing the packages for the Tire Gauge/Key Rings. Regal's Brass Tire Gauge/Key Ring box was admitted into evidence and it con-

forms with Regal's theme packaging as presented by Eysler except for the background color. The background is light gray instead of Regal's dark teal gray theme color. Eysler explained that she had not wanted that color on the packaging and had received a "charge back" from the printer of the box because it was not the correct color. Nevertheless, Regal sold that product in the package which had been provided. While a single misprinted order of boxes does not ruin an otherwise viable trade dress, the use of the wrong-colored boxes serves as another example of Regal's willingness to deviate from the trade dress which it now wishes to monopolize. Because the color of Kingsbridge's light gray box is practically identical to the misprinted box for which Eysler demanded a refund, it is apparent that, outside of the framework of this lawsuit, Regal does not consider the color of Kingsbridge's boxes to be the same as its theme color.

Accordingly, competitors cannot be prevented from employing a trade dress that is similar to but clearly different than Regal's, particularly when Regal has failed to use that dress on many of its products over a significant length of time. Indeed, monopolization of an intermittently used trade dress would be particularly unfair in the present case where the plaintiff sells an extremely varied line of products. In fact, simply by browsing through the plaintiff's catalog it appears that Regal would be able to preclude others from using its broadly defined theme packaging on items such as food dehydrators, clocks, picture frames, travel slippers, car vacuums, lamps, flashlights, bouquets of silk roses and Christmas earrings. All of these products are shown in the 1993 catalog, but none are shown with the theme packaging.[22]

■ In any event, even if Regal had consistently applied a single, identifiable theme trade dress to its packages it could not prevail under the Lanham Act. As mentioned earlier, trade dress is only protected when it is distinctive and there is a likelihood of

---

22. The Second Circuit has noted that state law unfair competition claims might be preempted when a plaintiff fails to establish Lanham Act protection for the design or configuration of a product that has not been patented. *See Land-*

*scape Forms,* 113 F.3d at 383. However, state law trade dress protection for packaging raises no such concern. *20th Century Wear, Inc. v. Sanmark–Stardust Inc.,* 747 F.2d 81, 92 n. 15 (2d Cir.1984).

confusion between it and an allegedly infringing trade dress. *Fun–Damental Too, Ltd.,* 111 F.3d at 999 (2d Cir.1997). Initially, a court must first determine whether a trade dress is 1) generic, 2) descriptive, 3) suggestive, 4) arbitrary or fanciful. *Fun–Damental Too,* 111 F.3d at 999–1000; *Jeffrey Milstein,* 58 F.3d 27, citing, *Abercrombie & Fitch, Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). Suggestive, arbitrary and fanciful trade dresses are inherently distinctive. *Two Pesos,* 112 S.Ct. at 2757. Descriptive trade dress, however, can either be protected or copied depending upon whether or not it has achieved secondary meaning in the market place. *Two Pesos,* 112 S.Ct. at 2757. Generic trade dress is not distinctive and can never be protected. *Two Pesos,* 112 S.Ct. at 2757.

 While a design of otherwise generic features is often inherently distinctive, *see Landscape Forms,* 113 F.3d at 378 *discussing Fun–Damental Too,* 111 F.3d at 1000, there is no "hard and fast" principle and "analysis will always require a look at the product and the market in which it competes." *Id.* at 379; *Mana Products, Inc. v. Columbia Cosmetics Mfg., Inc.,* 65 F.3d 1063, 1070 (2d Cir.1995). In addition, the Lanham Act "must be construed in the light of a strong federal policy in favor of vigorously competitive markets, which is exemplified by the Sherman Act and other anti-trust laws." *Landscape Forms,* 113 F.3d at 379. In light of this precedent, the trade dress on plaintiff's boxes is not especially creative or unique.

At trial, both Eysler and Gangi discussed their trade dress in terms of the purposes it serves in making clear to consumers what is actually inside of the package. The printing of the generic name of the product above the photo is designed to inform consumers of the contents of the package. The white line around the photo was referred to as a "target" which focuses the consumer's eye on the photo, and the copy on the sides of the box was designed to inform the consumer as to the functions of the product. All of these rather common features serve specific purposes that are aimed simply at giving customers information about the product. In fact, dozens of exhibits were introduced at trial, both during the defendants' case and the plaintiff's rebuttal, that showed how commonly novelty items are packaged in a colored rectangular box with a photo accented by some type of frame with lettering above the photo.[23]

In addition, as Eysler related, Regal's product line is often sold by agents who use photos of Regal's theme packaging after having covered the Regal logo so that retailers did not approach Regal directly after seeing an agent's brochure. If Regal's packaging were at all unusual in the novelty item industry, the agents' efforts would obviously be inadequate.

Further, the defendants' witnesses credibly explained that the design features that appeared on Regal's boxes were common and inexpensive features used in packaging novelty items. These assertions were corroborated by exhibits introduced by both defendants and plaintiff which used similar features to those that appear on Regal's boxes.

 Thus, despite the tendency for trade dresses to be inherently distinctive because the whole universe of materials and designs is available for packaging, Regal's extremely common packaging design is not inherently distinctive. However, Regal's packaging also is not generic, as defendants contend. An otherwise protectable trade dress can become generic within a particular market if the design becomes a standard or custom for the industry. *Mana Products,* 65 F.3d at 1070. While Regal's use of box designs are extremely similar to those of the other manufacturers, Regal is not using a design or color combination that has become a singular custom in the industry. *See Fun–Damental Too,* 111 F.3d at 1000. Consequently, while this case presents a close question for classi-

**23.** While plaintiff's witnesses did contend at some points that the purpose of the theme trade dress was to identify the source of the products, this testimony lacks credibility. In light of plaintiff's casual efforts to employ its trade dress on many of its products and the evasive answers which its officers frequently gave regarding what actually constituted the theme trade dress and the viability of other forms of packaging, these contentions by plaintiff were unpersuasive.

fication, after considering all of the reasons discussed above, the court finds plaintiff's theme trade dress to be descriptive within the market which it competes.

 When trade dress is descriptive, it must have obtained secondary meaning with consumers at the time of the alleged infringement in order to be protectable. *Two Pesos*, 505 U.S. at 769, 112 S.Ct. at 2757–2758. Secondary meaning simply means that a particular mark or dress has become " 'distinctive of the [producer's] goods in commerce.' " *Id., citing*, Lanham Act §§ 2(e), (f), 15 U.S.C. §§ 1052(e), (f); *Forschner*, 124 F.3d at 408; *Coach Leatherware Company, Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir.1991). To arrive at the factual conclusion of whether or not a trade dress has acquired secondary meaning courts consider "advertising expenditures, consumer studies, unsolicited media coverage of the product, sales success, attempts to plagiarize the mark, and length and exclusivity of use," *Id.*, at 169, *citing, Thompson Medical Co. v. Pfizer Inc.*, 753 F.2d 208, 217 (2d Cir.1985). These factors weigh against plaintiff. The record does not contain any proof regarding advertising expenditures or consumer studies made by the plaintiff. There are also no indications that Regal or its products have received any unsolicited media coverage or that there have been any other attempts to copy Regal's theme trade dress. While Regal had been using some form of its trade dress for five years at the time of the alleged infringement, Regal's inconsistent use of its theme trade dress undermines this factor. Indeed, even though Regal's sales figures were introduced at trial for the purpose of showing damages, Eysler admitted on cross-examination that since the theme color trade dress had been introduced, Regal's sales for many of its products have actually declined.[24]

 Nevertheless, someone involved in the production of Kingsbridge's boxes did follow much of Regal's design. However, conscious replication does not automatically establish secondary meaning, even when it is coupled with a favorable consumer awareness

survey. *See Coach Leatherware*, 933 F.2d at 169. Indeed, it appears likely that Regal's trade dress is such a common use of inexpensive packaging features in the relevant market place that defendants and their suppliers did not recognize that trade dress as protectable.

After considering the above factors, this court concludes that Regal has not demonstrated secondary meaning and its Lanham Act claim is denied.

**New York State Unfair Competition Law**

 In order to recover for unfair competition pursuant to New York State common law, a plaintiff must show actual confusion in order to receive damages or a likelihood of confusion in order to receive equitable relief. *Jeffrey Milstein*, 58 F.3d at 34. The crux of unfair competition is the "bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Forschner*, 124 F.3d at 408 (quotations and citations omitted). Regal introduced no evidence at trial to demonstrate that any retailer or ultimate consumer of any of its products was ever confused by the appearance of Kingsbridge's packaging. As a result, damages are not available.

 However, Regal's claim for equitable relief requires a more lengthy analysis. To determine whether or not a likelihood of confusion exists between products it is necessary to consider the nonexhaustive list of factors which Judge Friendly first put forth in the oft-cited *Polaroid Corp. v. Polarad Electronics Corp.*, 287 F.2d 492, 495 (2d Cir. 1961). Those factors are:

1) the strength of the prior owner's mark; 2) the similarity between the two marks; 3) the competitive proximity of the products; 4) the likelihood that the prior user will bridge the gap; 5) actual confusion; 6) the defendant's good faith; 7) the quality of defendant's product; and 8) the sophistication of the buyers.

24. Eysler stated that this decline was due solely to the fact that Regal had lost one of its biggest clients. While this assertion may be true, it in no

way reduces Regal's burden to put forth evidence of secondary meaning.

Id. at 495; *Fun–Damental Too*, 111 F.3d at 1002; *W.W.W. Pharmaceutical Co. v. Gillette*, 984 F.2d 567, 572 (2d Cir.1993); *Kraft General Foods, Inc. v. Allied Old English, Inc.*, 831 F.Supp. 123, 128 (S.D.N.Y.1993). No single factor in the list is dispositive and each factor should be weighed in the context of the others to determine if a likelihood of confusion exists. *W.W.W. Pharmaceutical, Co.*, 984 F.2d at 572 (2d Cir.1993); *Kraft General Foods*, 831 F.Supp. at 128. However, a court must still consider the similarity of the packages as a whole rather than simply tallying the similarities feature by feature. *Forschner*, 124 F.3d at 409.

### (1) Strength of the Mark

■ The strength of a plaintiffs mark or trade dress relies on the degree to which the trade dress identifies the goods sold in that dress as " 'emanating from a particular, although possibly anonymous source.' " *W.W.W. Pharmaceutical Co.*, 984 F.2d at 572, *quoting, McGregor–Doniger, Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979). This factor is affected by the degree to which the trade dress is distinctive within the *Abercrombie* spectrum, but is primarily determined by "the strength of the trade dress in its commercial context" and its " 'tendency to identify the goods as emanating from a particular source.' " *Fun–Damental Too*, 111 F.3d at 1003, *quoting, Centaur. Communications, Ltd. v. A/S/M Communications, Inc.*, 830 F.2d 1217, 1226 (2d Cir.1987); *W.W.W. Pharmaceutical Co.*, 984 F.2d at 572. Regal's trade dress is weak in both regards. First, Regal's asserted trade dresses are commonly used in its industry. Second, to the degree that any one of Regal's proffered trade dresses could identify a product's source in that industry, Regal has diluted its effectiveness by selling goods in varied boxes for years on end and Regal has submitted no significant evidence that consumers identify its packaging as identifying any single source. The strength of the trade dress is extremely weak. At best, Regal's packaging is descriptive and has not achieved secondary meaning.

### (2) Similarity of the Trade Dress

While Kingsbridge's trade dress is very similar in graphic design and typeface to the theme trade dress in which Regal does package some of its products, Kingsbridge's consistent trade dress is quite different from Regal's actual and varying trade dress which consumers encounter in stores. The size and shape of the two companies' boxes are similar, although most of the Kingsbridge boxes have cardboard tabs. More importantly, Kingsbridge's light gray background color is obviously different from Regal's gray teal blue theme color; and the photographs on the front and back panels of the Kingsbridge boxes do not bear any type of logo where the Regal logo normally appears. Indeed, the color of the Regal theme packaging and the photo on the front and back panels are the most striking features on its boxes. Clearly, Regal's gray was not copied and Regal cannot prevent the use of every shade of gray by other manufacturers. *See e.g., Forschner*, 124 F.3d at 409. The differences in color and in consistency of design prevent this factor from weighing in Regal's favor.

### (3). Proximity of the Products and (4) Bridging the Gap

Clearly, these factors weigh in plaintiff's favor. Regal and Kingsbridge already occupy the same market by competing to supply the same items to the same retailers.

### (5) Evidence of Actual Confusion

■ While demonstrating actual confusion in the marketplace is not necessary to prove a likelihood of confusion, actual confusion is strong evidence that a likelihood exists. Furthermore, this factor addresses the very purpose of unfair competition law, to keep a seller from passing off his goods as those of another. *Coach Leatherware Co.*, 933 F.2d at 170–171; *W.W.W. Pharmaceutical*, 984 F.2d at 574. As mentioned earlier, Regal did not offer any evidence of instances of actual confusion other than the occasion when its vice-president, Gangi, believed that a Revco store in Staten Island was selling Regal products. In the absence of any survey evidence or other instances of confusion among consumers, Gangi's experience of mo-

mentary confusion is not persuasive and this factor favors the defendants.

### (6) Good Faith

■ By itself, the act of copying a product's packaging does not create an inference that a defendant intended to cause confusion with the senior user's product. *Fun–Damental Too,* 111 F.3d at 1004–1005. At trial, Sommer testified that he had seen a copy of Regal's theme trade dress in the past in a showroom in Asia. Plainly, Sommer and Steven Moss, the buyer at Revco, were aware of the trade dress that Regal uses. Nevertheless, they both testified that they did not believe that the trade dress was protectable because it appeared to them to be a common arrangement of inexpensive packaging features which they had previously seen in similar combinations in the past. The many exhibits of other packaging for novelty items which were introduced at trial simply corroborate Sommer's and Moss' believable opinions. Many novelty items are available in rectangular boxes with the generic name of the product above the photo. Some of these packages use a typescript similar to Regal's and many packages use a white line or some other type of graphic to either frame or highlight a photo. While no boxes introduced at trial resemble the Regal packaging as closely as that of Kingsbridge, it is believable that both Sommer and Moss, after spending many years in the retail and novelty item business, would not consider Regal's particular combination of features to be protected trade dress.

In addition, as mentioned earlier, only half of Regal's product line had been converted to the theme packaging some five years after the theme design was created. Even the promotional brochures that Regal provided to Revco in order to attract Revco's business contained pictures of displays made up of boxes in both the new theme packaging and other nonconforming packaging that Regal had presumably used before. In light of this variation, Revco's inadvertent use of a Regal box does not indicate bad faith. Consumers who would have developed any sense of source identity with Regal's packaging over the years would, therefore, have to have de-

veloped such good will in a mixed trade dress, not a uniform one.

However, defendant's did not copy the variations in Regal's trade dress. Rather, they copied inexpensive and common features from the design of some of plaintiff's boxes and used a different background color. Thus, defendants uniformly applied a particular design which appeared on only some of Regal's boxes. As a result, any good will that plaintiff might have developed in the market place is not jeopardized by Kingsbridge's trade dress.

### (7) Quality of Defendant's Product

Plaintiffs do not contend that the goods sold by Kingsbridge were of an inferior quality to Regal's goods. Therefore, this factor does not assist plaintiff in its claim.

### (8) Sophistication of the Buyers

■ This factor is directed primarily to the circumstances that typically surround particular purchases and the approximate value of an item. *McGregor–Doniger,* 599 F.2d at 1137. The greater the value of an item the more care consumers are likely to use when considering a purchase. *Id.* at 1137.

All of the witnesses agreed that the products and the packaging in suit were expected to be inexpensive stocking stuffers that customers would purchase as an impulse item on their way out of the store. These novelty items were not expected to be carefully and thoughtfully scrutinized by consumers before purchase. Consequently, this factor favors the plaintiff.

### Balancing the Factors

After weighing and considering each of the *Polaroid* factors, the court finds that overall Regal has an extremely weak and inconsistent trade dress. In addition, the most distinctive feature which has been articulated as part of Regal's trade dress, the theme color; and the only feature to appear on all of its boxes, its logo; were not copied. Plaintiff's state unfair competition claim is denied.

### New York State Trade Dress Dilution Law

Further, Regal asserts that Kingsbridge's trade dress dilutes Regal's trade dress under New York's anti-dilution statute, N.Y.Gen.Bus.Law § 368–d (McKinney 1984). That section provides:

> Likelihood of injury to business reputation or of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief in cases of infringement of a mark registered or not registered or in cases of unfair competition, notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services.

*Id.* Dilution is based on the idea that the value of a mark to clearly and unmistakably distinguish one source should not be whittled away through an unauthorized use. *See Hormel Foods Corp. v. Jim Henson Productions, Inc.,* 73 F.3d 497, 506 (2d Cir.1996), *citing,* 3 McCarthy on Trademarks and Unfair Competition § 24.13[1][a] at 24–106 (3d ed.1995); *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.,* 42 N.Y.2d 538, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). To establish a dilution claim a plaintiff must show 1) ownership of a distinctive mark, and 2) a likelihood of dilution. *Hormel Foods, Corp.,* 73 F.3d at 506. However, because Regal's theme trade dress, when it is used, is descriptive and has not acquired secondary meaning, it is not distinctive. Thus, Regal's claim fails.

### CONCLUSION

Regal's claims are denied. Plaintiff's trade dress has been insufficiently articulated and employed to receive federal protection. In addition, its trade dress is at best descriptive in the context of the market in which it competes, and its theme packaging has not achieved secondary meaning in that market. Regal's state law claims are denied because its trade dress is inconsistent, not inherently distinctive, and does not identify Regal in the marketplace. Furthermore, Kingsbridge's trade dress has not caused any known instances of confusion among customers or retailers.

The Clerk of the Court is directed to enter judgment without costs accordingly.

IT IS SO ORDERED.