**The WALT DISNEY COMPANY, Walt Disney Pictures and Television, and Buena Vista Home Video, Plaintiffs,**

v.

**GOODTIMES HOME VIDEO CORP., Defendant.**

**No. 93 Civ. 2082 (MGC).**

United States District Court, S.D. New York.

Aug. 27, 1993.

Pattishall, McAuliffe, Newbury, Hilliard & Geraldson, Chicago, IL by Robert M. Newbury, Douglas N. Masters, Fitzpatrick, Cella, Harper & Scinto, New York City by Robert L. Baechtold, John J. Cotter, Fredrick M. Zullow, for plaintiffs.

Shea & Gould, New York City by Helene M. Freeman, Milton Gould, Jacques Rimokh, Darby & Darby P.C., New York City by Andrew Baum, for defendant.

## OPINION

CEDARBAUM, District Judge.

Plaintiffs The Walt Disney Company, Walt Disney Pictures and Television, and Buena Vista Home Video (collectively "Disney") sue GoodTimes Home Video Corporation ("GoodTimes") for allegedly infringing Disney's trade dress and assert theories of false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), deceptive practices and false advertising under New York General Business Law Sections 349 and 350, and common law unfair competition. Disney seeks an injunction barring GoodTimes from using a package for GoodTimes' *Aladdin* videocassette which Disney alleges has the look of the videocassette packaging Disney uses for its Classic Animated Features. While each of the packages is different, Disney argues that the packages have a similar overall look that constitutes a protectible trade dress. Disney analogizes this case to *Harlequin Enterprises Ltd. v. Gulf & Western Corp.*, 503 F.Supp. 647 (S.D.N.Y. 1980), *aff'd*, 644 F.2d 946 (2d Cir.1991), where the court found that the cover format of books in the plaintiff's romance novel series constituted a protectible trade dress.

In addition to denying Disney's claim, GoodTimes raises functionality as a defense. *See LeSportsac, Inc. v. K Mart Corp.,* 754 F.2d 71, 75–76 (2d Cir.1985). The functional aspects of packaging and product design are not protectible. *Id.*

After expedited discovery, in accordance with Fed.R.Civ.P. 65(a), trial of the action on the merits was consolidated with the hearing on the application for a preliminary injunction. A three-day bench trial was held. After hearing the evidence and weighing the testimony and the exhibits received in evidence, as well as the credibility of the witnesses, I make the following findings of fact and conclusions of law.

## BACKGROUND

The Walt Disney Company is a Delaware corporation with its principal place of business in Anaheim, California. Walt Disney Pictures and Television and Buena Vista Home Video, wholly owned subsidiaries of the Walt Disney Company, are both California corporations with their principal places of business in Burbank, California. Walt Disney Pictures and Television produces movies. Buena Vista Home Video produces and distributes videocassettes.

GoodTimes is a Delaware corporation with its principal place of business in New York. GoodTimes acquires home video programs from a variety of sources and distributes them for sale to mass-market retailers such as Wal–Mart, K–Mart and Toys "R" Us.

Disney began creating feature-length, fully animated motion pictures in the 1930's. Disney started to market these films on videocassette in the early 1980's. The following titles have been released by Disney on videocassette: *Robin Hood* (Pl's Ex. 5; originally released in 1984; rereleased in 1991); *Dumbo* (Pl's Ex. 11; originally released in 1981; rereleased in 1989); *The Sword in the Stone* (Pl's Ex. 10; originally released in 1988; rereleased in 1989); *Pinocchio* (Pl's Ex. 13; originally released in 1985; rereleased in 1993); *Alice in Wonderland* (Pl's Ex. 9; originally released in 1982; rereleased in 1989); *Peter Pan* (Pl's Ex. 6; released in 1990); *The Jungle Book* (Pl's Ex. 7; released in 1991); *Sleeping Beauty* (Pl's Ex. 2; released in 1986); *Lady and the Tramp* (Pl's Ex. 16; released in 1987); *Bambi* (Pl's Ex. 4; released in 1989); *Cinderella* (Pl's Ex. 8; released in 1988); *The Little Mermaid* (Pl's Ex. 3; released in 1990); *The Great Mouse Detective* (Pl's Ex. 15; released in 1992); *The Rescuers* (Pl's Ex. 17; released in 1992); *The Rescuers Down Under* (Pl's Ex. 18; released in 1991); *101 Dalmations* (Pl's Ex. 14; released in 1992) and *Beauty and the Beast* (Pl's Ex. 12; released in 1992). Disney currently sells to retailers only the first five titles. Disney stopped selling the last five titles on April 30, 1993. However, Ann Daly, the President of Buena Vista Home Video, testified that consumers will be able to purchase the last five titles from retailers for another 12 to 18 months, and virtually all of these videocassettes are available for rental. (Tr. at 194; 205–06)

Disney alleges that these 17 videocassettes comprise its family of Classic Animated Features. It is the packaging for these videocassettes which is at issue in this case. Disney argues that the packages have a similar overall look which consumers associate with Disney, and that GoodTimes' package for its *Aladdin* videocassette has the look of the packaging Disney uses for its Classic Animated Features.

Disney does not include *Fantasia* (Def's Ex. A) in its family of Classic Animated Features for the purpose of this action although Disney concedes that *Fantasia* is a Classic Animated Feature. (Tr. at 262) Daly explained that *Fantasia* was only released for 50 days and that it was packaged more elaborately to reflect the special feelings consumers have for the film. (*Id.* at 313–16) However, Daly testified that *Fantasia* is "part of the Disney Animated Classic look." (*Id.* at 316) Moreover, *Fantasia* is advertised with other Classic Animated Features. Promotional materials for the release of *101 Dalmatians* indicate that sales to retailers of *Fantasia* and *The Jungle Book* are being discontinued, and encourage consumers to purchase all three videos. (Def's Ex. K) Accordingly, I have considered *Fantasia's* videocassette package for the purpose of determining whether the packaging for the

Classic Animated Features has a consistent overall look.

Disney's *Aladdin* has not yet been released on videocassette; its videocassette trade dress was not in existence when GoodTimes released on videocassette its version of the *Aladdin* story. Thus, the videocassette packaging for Disney's *Aladdin* is not the trade dress allegedly infringed.

In June of 1992, after several months of negotiations, GoodTimes reached an agreement with American Film Investment Corporation ("AFIC") whereby AFIC would produce seven animated films based on children's literature in the public domain. GoodTimes was to finance the productions in exchange for exclusive distribution rights in the Western Hemisphere. The first two videocassettes released were *Pinocchio* and *Aladdin*. Both were released on March 1, 1993. These titles were selected in late 1991. (Tr. at 418) Andrew Greenberg, Senior Vice-President of Licensing and Acquisitions for GoodTimes, testified that when he arranged for *Pinocchio* and *Aladdin* to be made first, he was aware that Disney would be releasing a theatrical version of Aladdin later in 1992. (*Id.* at 417, 421–22) Greenberg testified that GoodTimes realized that Disney's release of *Aladdin* would generate a tremendous amount of interest in the classic story, and therefore GoodTimes wanted to release its version of the story. (*Id.* at 417–18) Greenberg was also aware that Disney was planning to rerelease *Pinocchio* on videocassette. (*Id.* at 421–22) Disney concedes that GoodTimes was entitled to release its version of the *Aladdin* story. (Pl's Prop. Find. of Fact & Concl. of Law, ¶ 64)

Susan Rosenberg, Vice–President of Special Projects for GoodTimes, was responsible for developing the packaging for the *Aladdin* videocassette. (Rosenberg Dep. at 20) Rosenberg began work on the package in November, 1992. To create an illustration for the front of the package, Rosenberg sent to two artists sketches of the characters since the videos were not complete. (*Id.* at 23–24) Because she was not pleased with the drawings, she asked Diane Eskenazi, the AFIC producer of *Aladdin*, to recommend an artist. Eskenazi recommended Len Smith,

an animator who had created the characters for GoodTimes' *Aladdin*. (*Id.* at 28–29) Rosenberg stated that Eskenazi had told her that Smith had worked for Disney in the past. (*Id.* at 39) At trial, the parties stipulated that Smith was a Disney employee when he made the drawing which GoodTimes used for the cover of its *Aladdin* videocassette package. (Tr. at 395–96) Defendant was not aware of that fact when Smith made the drawing.

Rosenberg spoke directly with Smith on approximately two occasions; primarily she communicated with him through Eskenazi. (Rosenberg Dep. at 34) Rosenberg informed Eskenazi of the dimensions of the containers in which GoodTimes planned to package *Aladdin*. Eskenazi was to relay these dimensions to Smith. GoodTimes planned to use both clamshell, a plastic video box which opens like a book, and slip sleeve, a cardboard video box. With respect to the clamshell, Rosenberg noted that it was "plastic like Disney." Rosenberg explained that Smith needed this information to achieve the correct size for the illustration, and that she wanted to convey that *Aladdin* would be packaged in both clamshell, with which he might have been familiar from his work with Disney, and slip sleeve. (*Id.* at 39) GoodTimes ultimately selected Smith's drawing, with some modifications, as the basis for the cover illustration on its *Aladdin* videocassette package.

GoodTimes' *Aladdin* (Pl's Ex. 33) is packaged in a white clamshell container. The title of the film is located at the top of the package. The cover art depicts characters from the film. Below a large illustration of Aladdin and the genie are smaller cameos of the princess and the villain in red curlicue designs. The characters have a three-dimensional appearance. GoodTimes identifies the source of the video. Above the title is the phrase "A Goodtimes Classic Animated Feature" written in script. GoodTimes also placed its name on the back of the package in two places. GoodTimes' *Aladdin* has a suggested list price of $19.99 and is one of GoodTimes' higher priced videos.

In 1985 or 1986, GoodTimes had released a version of the *Aladdin* story on a videocas-

sette which contained four other stories. (Def's Ex. CV) The cover of that videocassette is illustrated with a scene from *Tom Sawyer,* another story on the videocassette. The current *Aladdin* is the only full-length animated version of the *Aladdin* story that GoodTimes has released.

## DISCUSSION

Section 43(a) of the Lanham Act provides:

Any person who, or in connection with ... any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof ... which ... is likely to cause confusion, or to cause mistake, or to deceive ... as to the origin, sponsorship, or approval of his or her goods ... by another person ... shall be liable in a civil action by any person who believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a).

■ This statute protects trade dress. Trade dress is the total image of a product, " 'includ[ing] features such as size, shape, color or color combinations, texture [or] graphics.' " *Paddington Corp. v. Attiki Importers & Distributors, Inc.,* 996 F.2d 577 (2d Cir.1993) (alterations in original) (citations omitted). Trade dress traditionally refers to the packaging or labeling of a product, but may also include the appearance of the product itself. *Stormy Clime, Ltd. v. ProGroup, Inc.,* 809 F.2d 971 (2d Cir.1987).

■ The trade dress Disney seeks to protect is the overall look of the videocassette packaging of its Classic Animated Features. Plaintiffs argue that these videocassette packages have a consistent and uniform look which consumers associate with Disney, and that GoodTimes infringed the Disney trade dress by selling an *Aladdin* videocassette in packaging which has the look of the packaging Disney uses for its Classic Animated Features.

Disney's claim differs from most trade dress claims in that the alleged trade dress is not a specific package or the appearance of a single product, but rather the overall look of a number of different packages. *Compare Paddington,* 996 F.2d 577 (trade dress at

issue was the packaging for Ouzo No. 12 beverage); *George Basch Co., Inc. v. Blue Coral, Inc.,* 968 F.2d 1532 (2d Cir.1992) (packaging for NEVER–DULL, a metal polish); *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131 (2d Cir.1992) (packaging for HAPPYCUBE puzzle); *Coach Leatherware Co., v. AnnTaylor,* 933 F.2d 162 (2d Cir.1991) (three specific handbag designs—the "Dinky Bag," the "Duffel Sac" and the "Convertible Clutch"); *Stormy Clime,* 809 F.2d at 971 (design for COOLIT rain jacket); *Dallas Cowboys Cheerleaders, Inc. v. Pussy Cat Cinema, Ltd.,* 604 F.2d 200 (2d Cir.1979) (design of Dallas Cowboys Cheerleader uniform).

In light of this difference, Disney has a burden which most plaintiffs alleging trade dress infringement do not need to carry. Disney must establish the existence of a recognizable trade dress. That is, Disney must establish that its videocassette packages have a consistent overall look. If established, this trade dress is entitled to protection under Lanham Act § 43(a) if it is distinctive, meaning capable of identifying Disney as the source of the videocassettes, and if Good-Times' trade dress is likely to mislead consumers to believe that GoodTimes' *Aladdin* is the Disney version. *Two Pesos, Inc. v. Taco Cabana, Inc.,* —— U.S. ——, ——, 112 S.Ct. 2753, 2758, 120 L.Ed.2d 615 (1992).

The most analogous trade dress case, and one on which Disney relies heavily, is *Harlequin Enterprises Ltd. v. Gulf & Western Corp.,* 503 F.Supp. 647 (S.D.N.Y.1980), *aff'd* 644 F.2d 946 (2d Cir.1981). In *Harlequin,* the court found that the cover design of the books in the plaintiff's "Harlequin Presents" series constituted a protectible trade dress. The trial judge described the format of each of the 372 volumes in the series as "identical." *Harlequin,* 503 F.Supp. at 649. Each volume had a glossy white cover of six and three-quarter inches. Each bore the Harlequin trademark, a black and white sketch of a Harlequin located in a gold diamond, at the top of the cover. Gold filigree extended from both sides of the diamond. The series number was located in the top left corner, and the price in the top right corner. Underneath the Harlequin mark was the title of the

series, "Harlequin Presents." The author's name was printed in large colored letters under the series title. A thin gold line separated the author's name and the book's title, which was printed in lower case block letters. Below the book title was a circular-shaped colored drawing featuring a man and a woman against a background of scenes depicting the story line. The picture was encircled by two gold lines. Gold filigree was located at the bottom of the cover. *Id.* at 649.

Also analogous is *Chevron Chemical Co. v. Voluntary Purchasing Groups,* 659 F.2d 695 (5th Cir.1981), *cert denied* 457 U.S. 1126, 102 S.Ct. 2947, 73 L.Ed.2d 1342 (1982), where the court extended protection to the plaintiff's "family" trade dress. The packages at issue were bottles for a number of different lawn and garden products. The packages consisted of brown bottles with labels containing three horizontal colored bands. The top 20% of the label was white, the middle 30% of the label was yellow, and the bottom 50% was red. *Id.* at 697. The "ORTHO" trademark was printed on the white band in bold black letters. The yellow band contained the name of the particular product which was also printed in black letters. The red band contained the required warnings. *Id.*

Daly testified that the look of the packaging for the Disney Classic Animated Features is hard to describe. (Tr. at 185) According to Daly, the look consists of the white clamshell box, the layout of the artwork, the positioning of the title, the use of color, particularly the color blue, and the artwork, particularly the three-dimensional look of the characters. (Tr. at 185–86)

Unlike the packages at issue in *Harlequin* and *Chevron,* the format of each of Disney's videocassette packages is different. Daly explained that the title of the film is one of the most dominant components of the look of Disney's Classic Animated Features. (Tr. at 187) The size and style of title lettering are different for each videocassette. Additionally, the colors used for the lettering vary. Red lettering is used for *The Rescuers, 101 Dalmatians, Bambi, Pinocchio* and *Robin Hood;* gold lettering is used for *The Rescuers Down Under, Beauty and the Beast, Sleeping Beauty* and *The Sword in the*

*Stone;* orange lettering is used for *Peter Pan, Lady and the Tramp* and *Dumbo;* yellow lettering is used for *Alice in Wonderland* and *The Great Mouse Detective;* white lettering is used for *Cinderella;* blue lettering is used for *The Little Mermaid;* purple lettering is used for *The Jungle Book,* and gold metallic lettering is used for *Fantasia.* While the title of each film is located on the top third of the package, placement within this area varies. Artwork generally is not located above the film title. However this is not true of *Bambi, Sleeping Beauty,* and *Peter Pan.*

Disney has not used the word "classic" consistently. Prior to 1988, the word was not placed above the title. *See* original versions of *Robin Hood* (Def's Ex. Y), *Dumbo* (Def's Ex. I) and *Pinocchio* (Def's Ex. O); *Sleeping Beauty* (Pl's Ex. 2) and *Lady and the Tramp* (Pl's Ex. 16). Beginning with *Cinderella,* Disney placed the word classic above the title. However, *Alice in Wonderland* was rereleased without "classic" in this position. Nor do *Pinocchio* and *Fantasia* contain this word. Instead, "masterpiece" was used because surveys indicated that consumers perceived these films to be "the gems out of the animated group." (Tr. at 316)

When "classic" is placed above the title, the phrasing varies. The phrase "Walt Disney's Classic" appears on seven packages; the phrase "A Walt Disney Classic" on six packages. The size of the print varies. "Classic" is printed in large block letters, medium-sized block letters, and small block letters.

The videocassette packages all bear the name Walt Disney in clear legible letters above the title. This packaging feature, one of the few consistently used by Disney, identifies Disney as the source of the videocassettes. GoodTimes' *Aladdin* bears the name GoodTimes, not Disney.

Each videocassette package is illustrated with a scene from the film. The characters depicted generally have a sculptured or three-dimensional appearance. Placement and size of the characters depicted vary. The colors used, both for the characters and background, also vary. While blue is a com-

monly, but not uniformly, used background color, the shades of blue differ significantly.

The packaging does not expressly identify the films as members of a series, family or collection. The phrase "Classic Animated Feature" does not appear on any of the packages. While the term "The Classics," enclosed in a diamond, appears on the spine of each videocassette package other than *Pinocchio* and *Fantasia*, retailers typically display the videos with their front covers facing forward, so that this logo is not readily visible to consumers. (Tr. at 318) The Disney videocassettes are not numbered sequentially. Daly testified that the videos are sometimes promoted as a collection. (*Id.* at 206) However, the collection promoted frequently includes films which are not Classic Animated Features, but rather are members of a broader family of Disney films which Daly characterized simply as "Classics." (Def's Ex. K, L and BA) "Classics" are films which are part live action and part animation. (Tr. at 250–51) "Classics" currently sold by Disney include *The Three Caballeros* (Def's Ex. B), *Mary Poppins* (Def's Ex. D), *Pete's Dragon* (Def's Ex. E) and *So Dear to my Heart* (Def's Ex. F). Disney does not allege that these videocassette packages have the look of the packaging used for the Classic Animated Features or that GoodTimes' *Aladdin* videocassette package resembles them.

Daly explained why the format for the videocassette packages varies. In creating the packaging for a video, Disney attempts to replicate the look of the film. Thus, the film dictates the shape and color of the title lettering and the colors used. (*Id.* at 245, 247) Additionally, Disney occasionally alters packaging format to reflect consumer perception of a film. The packages for *Pinocchio* and *Fantasia*, films which Disney believes are viewed as "extra special," bear the term "Masterpiece" rather than "Classic." Disney further differentiated *Fantasia* by using a black clamshell container.

As indirect evidence that the videocassette packaging used for the Classic Animated Features has a consistent overall look, Disney has submitted the deposition testimony of seven consumers who purchased GoodTimes' *Aladdin* because they thought it was a Disney video. Disney has also submitted the deposition of a consumer who did not purchase the video because, after closely examining it, she realized it was not the Disney version, and deposition testimony of a retailer who refused to carry GoodTimes' *Aladdin* because he feared that consumers would think it was the Disney version. All of these individuals testified that their confusion stemmed from GoodTimes' packaging. However, several of the consumers made remarks which indicate that their belief that GoodTimes' *Aladdin* was the Disney version also was based on the fact that they associate the title *Aladdin* with Disney. *See* Roy Grendler Dep. at p. 15, 20–22; Wambold Dep. at 15–16, 30–31; Borovsky Dep. at 10, 20–21. Such comments weaken the probative value of these isolated instances of consumer confusion.

After observing the demeanor of the witnesses on direct and cross-examination, and weighing the evidence, particularly after viewing the videocassette packages of the Classic Animated Features, I find that Disney's videocassette packages do not have a consistent overall look, and therefore the trade dress that Disney alleges GoodTimes infringed does not exist. While there are similar packaging features, such as the general use of a white clamshell container, the title of a public domain story placed on the top third of the package, the name "Walt Disney," above the title, although not always in the same style or color of lettering, and the three-dimensional character depiction, these similarities, in light of the differences in package format described above, are not sufficient to give the packages an identifiable trade dress.

■ Moreover, GoodTimes has borne its burden of proving that the packaging features which Disney consistently uses, and which GoodTimes also used for its *Aladdin* videocassette, are functional elements of premium priced videocassette packaging, and therefore Disney's arrangement of these features is not eligible for trade dress protection. A trade dress feature is functional if it is essential to the purpose of the package or if it affects the cost or quality of the package. *See Stormy Clime*, 809 F.2d at 975. A

court's functionality inquiry should focus on whether "bestowing trade dress protection upon [the plaintiff's] arrangement of features 'will hinder competition or impinge upon the rights of others to compete effectively in the sale of goods.'" *Id.* at 976–77 (citations omitted). A unique arrangement of purely functional features constitutes a functional design. *Id.* at 977.

Clamshell and slip sleeve are the forms of packaging most widely used in the home video sell-through market, the market for videocassettes which are sold, rather than rented, to consumers. Daly testified that in the early 1980's most films were in clamshell packaging. (Tr. at 304–05) The use of clamshells waned in the mid-eighties, but by the late-eighties manufacturers began using clamshell packaging for their higher priced videos. (*Id.* at 308) Disney packages its less expensive videos in slip sleeve, and uses clamshells for its higher priced videos, which includes videos other than the Animated Classics. *See DuckTales The Movie Treasures of the Lost Lamp* (Def's Ex. G); *The Three Caballeros* (Def's Ex. B); *Bedknobs and Broomsticks* (Def's Ex. C); *Mary Poppins* (Def's Ex. D); *Pete's Dragon,* (Def's Ex. E); *So Dear to my Heart* (Def's Ex. F). In fact, Disney test marketed *Alice in Wonderland,* a higher priced video, in both slip sleeve and clamshell, and found that the videocassette sold better in clamshell. (Tr. at 191–92) GoodTimes also packages its more expensive videos in clamshell. (*Id.* at 450–51) Thus, clamshell packaging, which is more durable, is used by the industry as a means of distinguishing higher priced videos from lower priced ones, and is necessary for effective competition. White clamshells are the least expensive because Disney, which orders so many, has driven down the price. (*Id.* at 192)

Disney characterizes the titles of the Classic Animated Features as "[n]ame[s] of [f]amous Disney [m]otion [p]icture[s]." (Pl's Post–Trial Brief at 6) In fact, the titles are well-known names of public domain stories.

Disney cannot claim a protectible interest in these titles because Disney cannot deprive other story-tellers of "the right to call an article by its name." *Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976).

With respect to the location of titles, Daly testified that the title is placed on the top of the package because, in light of the manner in which videocassettes are displayed in stores, the title is most visible in this position. (Tr. at 188) Disney's placement of its name above the title can be attributed to the same desire for visibility. Thus, Disney's places its name and the title at the top of the package for a purely functional reason—to insure that they will be seen. As previously noted, GoodTimes also placed its name above the title. This prominent placement of the source of the videocassettes "can go far towards eliminating any possible confusion." *See Bristol–Myers Squibb Co. v. McNeil–P.P.C., Inc.,* 973 F.2d 1033, 1046 (2d Cir. 1992).

Disney argues that the characters depicted on its videocassette covers have a three-dimensional or sculptured look which consumers identify with Disney. John E. Musker, a writer, producer and director at Walt Disney Pictures and Television, explained that this look is largely a result of a technique known as air brushing. (Tr. at 153) Musker testified that while the high cost of air brushing precludes most studios from using the technique in their films, he has seen it used in advertising and on video covers.[1] (*Id.* at 155–56) Disney does not dispute that it does not have exclusive rights to air brushing or the other animation techniques it uses. (Pl's Post–Trial Brief at 7–8) Accordingly, Disney cannot claim a monopoly in the results of these animation techniques.

Finally, Daly and Musker both testified at length that the artwork on Disney's videocassette packages replicates the look of the films themselves. Daly explained that "the art selection represents a fairly critical moment

1. At trial, Disney sought to prove that the characters depicted on the cover of GoodTimes' *Aladdin* videocassette did not represent the characters in the film. The amended complaint contains no such allegation. Moreover, at the hearing on

Disney's application for a temporary restraining order, Disney's counsel stated that "[w]e don't claim that the characters in the cassette are essentially different from what appears on the cover." (4–8–93 Tr. at 3)

in the film, or, ... the critical characters that make up that story." (Tr. at 188) Because the cover illustration serves one of the purposes of videocassette packaging, displaying to consumers the contents of the tape, the illustration is functional.

Thus, I find that GoodTimes has proved by a preponderance of the evidence that each of the features consistently used by Disney is purely functional, and therefore that Disney's arrangement of these features is not protectible. *See Stormy Clime*, 809 F.2d at 977.

After carefully considering all of the evidence, I find that Disney has not proved the existence of the trade dress that it alleges GoodTimes infringed. GoodTimes has proved that the only packaging features that Disney uses consistently are functional, and not protectible. In light of these conclusions, Disney's claims under the Lanham Act fail, as do its claims under New York law.

## CONCLUSION

The foregoing shall constitute my findings of fact and conclusions of law in accordance with Fed.R.Civ.P. 52.

The clerk is directed to enter judgment for defendant.

SO ORDERED.