**ROSE ART INDUSTRIES, INC., a New Jersey Corporation, Plaintiff,**

v.

**RAYMOND GEDDES AND COMPANY, a Maryland Corp., Defendant.**

Civ. No. 98–2263(JAG).

United States District Court, D. New Jersey.

Nov. 20, 1998.

Roslyn S. Harrison, McCarter & English, LLP, Newark, New Jersey, for plaintiff.

Kathryn Miller Goldman, Donna M.D. Thomas, Astrachan, Gunst, Goldman & Thomas, Baltimore, Maryland, Shalom D. Stone, Walder, Sondak & Brogan, P.A., Roseland, New Jersey, for defendants.

## AMENDED OPINION

GREENAWAY, District Judge.

This matter comes before the Court on the motion for a preliminary injunction of McCarter & English, LLP, counsel for plaintiff Rose Art Industries, Inc. ("Rose Art"), seeking to enjoin its competitor, defendant Raymond Geddes and Company ("Geddes"), from distributing any stationary products packaged in Geddes' KidStuf 2 packaging, Geddes' ARTiculates packaging or Geddes' New Package Design or any other package confusingly similar to the trade dress Rose Art uses to package its crayon, marker and colored pencil products. For the reasons set forth herein, Rose Art's motion is denied.

### FACTS

Rose Art, a New Jersey corporation, has been in the business of selling stationary products for over 70 years. Those products include, *inter alia*, crayons, colored pencils and markers. Rose Art is currently the second-largest seller of children's crayons in the United States, surpassed only by Crayola.

Rose Art claims that its trade dress[1] for crayons, markers and colored pencils is characterized by the following elements: (1) a prominent straight or wavy black or colored band across the middle of the front of the package and extending to the sides with the words "CRAYONS" or "WASHABLE MARKERS" or other descriptive term in white letters across the band (the "Band and Letter Feature"); (2) a yellow background on the top half or two-thirds of the package with a contrasting background color on the bottom of the package; (3) a prominent display of the Rose Art logo either with or without a rainbow swish design behind the logo on the front of the package; (4) the statement "since 1923";[2] (5) a statement on the front of the package that the product is "Certified Non–Toxic";[3] and (6) a sentence inviting consumer comments: "Rose Art invites your comments and questions about this product. Please write to Rose Art Industries, Inc., Consumer Affairs, 6 Regent St., Livingston, NJ 07039 or call 1–800–CRAYONS".[4] See Pl.'s Br. in Supp. of Application for Prelim. Inj. at 2–3.

Rose Art asserts that there are three subgroups within its trade dress: the Rose Art Primary Color Packaging, the Rose Art Neon Color Packaging and the Rose Art Color Fade Packaging.[5] Rose Art contends that the Rose Art Primary Color Packaging is used to package traditional crayons, markers and chalk products and features a straight or wavy black band with the product's descriptive term in white letters across the band, a yellow background on the top half of the package and the Rose Art logo with the rainbow swish on the bottom of the package in front of a red or purple background. See Amended Compl., Ex. A.

The Rose Art Neon Color Packaging is used for wild color crayons and scented, shaped or color change markers. This packaging features a straight or wavy black or colored band with the product's descriptive term in white letters across the band, a yellow background on the top of the package and the Rose Art logo with the rainbow swish on the bottom of the package in front of a pink or purple background. See Amended Compl., Ex. B.

The Rose Art Color Fade Packaging was initially only used to package products sold at Wal–Mart. The Rose Art Color Fade Packaging is now used for crayons, bold and classic markers, colored pencils and modeling clay. It features a black band with the product's descriptive term displayed in white letters across the band, the Rose Art logo in red letters above the band, a yellow background on the top of the package and a color fade from purple to red background on the bottom of the package. In addition, the packaging for colored pencils and some crayon products displays crayons or colored pencils on the bottom right hand corner of the package. See Amended Compl., Ex. C. Rose Art admits that some of its packages combine features from more than one of the subgroups. See Amended Compl., Ex D.

Defendant Geddes, a Maryland corporation, was founded in 1924, but sold mostly novelty items. Geddes then expanded into the sale of office supplies and stationary products to elementary school bookstores.[6] Geddes did not have its own line of crayon products but it purchased third party crayon products, such as Crayola and Sargent, for resale to elementary school bookstores. In 1994, Geddes developed its own line of crayons called "Spectrum", which it marketed and sold to elementary school bookstores in packaging that was designed by an independent designer. Engagement Manufacturing Company, a Taiwanese company that also

---

1. Trade dress is defined as the total image or appearance of a product or its packaging. See *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 765 n. 1, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992).

2. Other crayon manufacturers have similar statements. For example, the Prang crayon box bears the legend "since 1795". The Sargent crayon box bears the legend "Teachers' Choice since 1933". See Thomas Cert., Ex. 6.

3. Crayola uses this same legend.

4. Crayola uses a similar legend.

5. Rose Art seeks trade dress protection for each of the subgroups.

6. The record does not reflect the date when Geddes began selling stationary products.

manufactures Rose Art's crayon products, manufactured Geddes' Spectrum line of crayons.

In 1996, Geddes decided to expand its sale of stationary products beyond school bookstores and into national mass merchandise retails outlets. Geddes hired Chris Blackmon as its national sales manager to develop mass market distribution channels for Geddes' products. Thereafter, under Mr. Blackmon's direction, Geddes' Creative Director, Aleksandra Gulan, developed and introduced to mass merchandise stores a line of stationery products packaged in a trade dress referred to as KidStuf 1. *See* Amended Compl., Ex. E. The KidStuf 1 line included markers and colored pencils, but not crayons. Geddes hired Carl Swanson to act as its manufacturer's representative to help Geddes sell their products to mass merchandisers. Mr. Swanson was also Rose Art's representative.

In 1997, Geddes decided to further expand its mass market offerings by designing an art supply line, including a full range of marker, colored pencil and crayon products. Geddes decided to target older children, ages 10–12, for the sale of its new art supply line. Geddes named the new art supply line "ARTiculates" to convey that "the product was a more sophisticated art and craft product." Def.'s Br. in Opp'n to Pl.'s Application for Prelim. Inj. at 4.

Geddes felt that the KidStuf 1 package design was not suitable for a mass market art supply line so it decided to create a new package design for its ARTiculates line. Before creating the new package design. Ms. Gulan and Mr. Blackmon obtained samples and catalogues of other manufacturers' retail stationary products including Rose Art's. Ms. Gulan completed the ARTiculates packaging in September 1997, in time for Geddes to show its new art supply line at the Stationary Home and Office Products Association ("SHOPA") trade show [7] in November, 1997. The ARTiculates packaging is characterized by the use of yellow as a background color with a contrasting bold, bright color, illustrations of the product on the box and the product name in white letters on a black oval-shaped band. The ARTiculates package also features the legend "since 1924" and a statement that reads: "We invite your comments about our product. Please write to: Raymond Geddes & Company, Consumer Affairs, P.O. Box 24829, Baltimore, MD 21220". Neither of these legends had ever appeared before in Geddes' products.

In July, 1997, Dollar General Corporation ("Dollar General") [8] conducted its standard annual bid process known as a line review, at which time Dollar General accepted bids from different manufacturers who sought to supply Dollar General with their stationary products for 1998. Rose Art instructed its manufacturer's representative, Mr. Swanson, who unbeknownst to Rose Art was also Geddes' manufacturer's representative, to submit bids to Dollar General for Rose Art's products. Rose Art alleges that Mr. Swanson failed to submit bids for a number of Rose Art's products. However, he submitted bids to Dollar General on behalf of Geddes for Geddes' stationary products.

In August, 1997, Mr. Blackmon (Geddes' national sales manager) and Mr. Swanson met with Gail Moore, the Dollar General buyer for the stationary department. Geddes showed Ms. Moore its KidStuf 1 line of products.[9] Later, in a second meeting on October 2, 1997, Geddes showed Ms. Moore some samples of crayon and marker products in its ARTiculates packaging. Ms. Moore expressed interest in Geddes' ARTiculates products; however, she did not like the ARTiculates packaging because it was too wordy, busy and dull. *See* Moore Dep. at 50:19–51:5. She told Mr. Blackmon that she was looking for a package that was more basic, simple and colorful. *Id.* at 51:6–10. Specifically, a package that would appeal to younger children. *Id.* Ms. Moore instructed Mr. Blackmon to create a package that

7. The SHOPA trade show is a yearly exhibition of stationary products.

8. Dollar General is a multi-billion dollar discount retailer with over 3,600 stores nationwide.

9. The record does not reflect the outcome, if any, of that meeting.

looked more like Crayola.[10] *Id.* at 51:11–22. Geddes agreed to provide Ms. Moore with revised packaging artwork within a few days.

Based on Ms. Moore's directions, Mr. Blackmon instructed Ms. Gulan to redesign the ARTiculates packaging using the KidStuf brand name and modifying the package so that it was brighter and simpler. Blackmon Dep. at 242:18–243:5; Gulan Dep. at 53:4–12. The new design, which the parties refer to as KidStuf 2, is characterized by a bright yellow background on the top half of the package with a bright contrasting color on the bottom, the product name in white letters on a black band on the middle of the package, a rainbow backdrop (swish) on which the Kid-Stuf mark is superimposed, a statement that the product is "Certified Non–Toxic", the legend "since 1924" and a statement that reads: "We invite your comments about our product. Please write to: Raymond Geddes & Company, Consumer Affairs, P.O. Box 24829, Baltimore, MD 21220".

On October 6, 1997, Mr. Blackmon sent Ms. Moore artwork depicting the KidStuf 2 package design. On October 10, 1997, Geddes forwarded to Ms. Moore 48 mock up packages which were comprised of other manufacturers' crayon packages, including Rose Art's, with Geddes' computer generated, preliminary artwork depicting the Kid-Stuf 2 package design wrapped around another manufacturer's package. Geddes supplied Dollar General with the 48 mock up packages for its planogram room—a room in which a new product is displayed as if it were in a store—for purposes of review by Dollar General's executives as part of the line review process for selecting new vendors.

In December, 1997, after completing its standard review line process, Dollar General selected Geddes to be its primary supplier of stationary products for 1998.

On May 20, 1998, Rose Art filed the instant action by Order to Show Cause alleging that Geddes' KidStuf 2 packaging and the ARTiculates packaging are confusingly similar to Rose Art's trade dress, especially the Rose Art Primary Color Packaging, in violation of the Lanham Act.[11] Specifically, Rose Art objects to (1) the KidStuf 2 black band and white letters, (2) the yellow background on the top of the package with the contrasting color on the bottom of the package, (3) the rainbow swish behind the term KidStuf, (4) the legend "since 1924", (5) the legend "Certified Non–Toxic", (6) the window through which the crayons are displayed and (7) Geddes' consumer legend which states: "We invite your comments about our product. Please write to: Raymond Geddes & Company, Consumer Affairs, P.O. Box 24829, Baltimore, MD 21220". Rose Art seeks to enjoin Geddes from distributing any stationary products packaged in the KidStuf 2 or the ARTiculates packaging.[12]

In an attempt to settle this litigation, in July, 1998, Geddes created a new package design for its stationary products which the parties refer to as Geddes' New Package Design. Geddes' New Package Design prominently displays Geddes' logo "Raymond Geddes" below the product's name. The box is characterized by a gold-yellow color on the top portion of the box and a contrasting purple-magenta on the bottom. The product's name (e.g., crayons) is featured in white letters on top of a multi-tiered band with each tier in a different shade of blue. Geddes' New Package Design displays the products themselves by using a die cut through which real marker and pencil products are

---

10. Rose Art asserts that this comment must be a fabrication because the resulting package does not resemble Crayola; it rather resembles Rose Art. The Court need not decide this purported credibility issue because it is not central to the issues the Court must determine on trade dress per se.

11. Rose Art asserts that it filed the instant suit five days after it discovered that Dollar General had approved Geddes' KidStuf 2 packaging. Geddes claims that by the time Rose Art filed this suit, it had already ordered the KidStuf 2 packaging.

12. In its Complaint, Rose Art asserts claims against Mr. Swanson and Geddes for misappropriation of Rose Art's trade secrets. Rose Art and Mr. Swanson settled. Although Rose Art's claims against Geddes for misappropriation of trade secrets have not been resolved, the only issue before the Court on Rose Art's motion for a preliminary injunction is whether Geddes' packaging infringes Rose Art's trade dress.

visible and by using illustrations of crayons, arranged in a rainbow design. Rose Art alleges that Geddes' New Package Design is confusingly similar to its trade dress, especially the Rose Art Neon Color Packaging.

Rose Art seeks to enjoin Geddes' KidStuf 2, ARTiculates and New Package Design as part of its request for relief. Rose Art seeks trade dress protection for the overall look of its various packages for crayon, marker and colored pencil products on the ground that these packages comprise a protectable family trade dress. Even though courts within this circuit have never addressed whether trade dress protection extends to a series or line of products, courts within other circuits have granted trade dress protection to families of products if the various packages for different products convey a consistent and overall look such that it is clear to the consumer that the products are all part of the same family.

## DISCUSSION

### Standard for a Preliminary Injunction

■ In addressing a motion for a preliminary injunction, the court must consider: (1) the likelihood that Rose Art will prevail on the merits; (2) the extent to which Rose Art is being irreparably harmed by Geddes' conduct; (3) the extent to which Geddes will be irreparably harmed if the court issues the preliminary injunction; and (4) whether granting the preliminary injunction is in the public's interest. *Duraco Prods., Inc. v. Joy Plastic Enterprises, Ltd.,* 40 F.3d 1431, 1438 (3d Cir.1994); *see also Opticians Ass'n of Am. v. Independent Opticians of Am.,* 920 F.2d 187, 192–93 (3d Cir.1990).

### Lanham Act

Section 43(a) of the Lanham Act creates a federal cause of action for unfair competition. *See American Greetings Corp. v. Dan–Dee Imports, Inc.,* 807 F.2d 1136, 1140 (3d Cir. 1986). It prohibits the sale of goods by use of "any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, which—(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person ..." 15 U.S.C. § 1125(a) (1988).

■ Recovery under section 43(a) is not restricted to registered trademarks; section 43(a) also provides protection to "words, symbols, collection of colors and designs ... that the purchasing public has come to associate with a single source." *RJR Foods, Inc. v. White Rock Corp.,* 603 F.2d 1058, 1059 (2d Cir.1979); *see also Duraco,* 40 F.3d at 1438. Thus, section 43(a) provides a cause of action for trade dress infringement. *See Duraco,* 40 F.3d at 1438; *American Greetings,* 807 F.2d at 1140.

### Identifying Trade Dress

■ Trade dress is defined as the total image or overall design or appearance of a product or its packaging. *See Two Pesos, Inc. v. Taco Cabana, Inc.,* 505 U.S. 763, 765 n. 1, 112 S.Ct. 2753, 120 L.Ed.2d 615 (1992); *American Greetings,* 807 F.2d at 1141; *Freixenet, S.A. v. Admiral Wine & Liquor Co.,* 731 F.2d 148, 153 (3d Cir.1984) (trade dress is the "total package"). Trade dress may include features such as size, shape, color, or color combinations, texture and graphics. *Two Pesos,* 505 U.S. at 765 n. 1, 112 S.Ct. 2753; *see also* J. Thomas McCarthy, 1 McCarthy on Trademarks and Unfair Competition § 7:40 (4th ed.1996) [hereinafter "McCarthy"] (single color or color combination is capable of trade dress protection). Package trade dress functions as a trademark and is used by consumers to identify a company's product. *See Knorr–Nahrmittel A.G. v. Reese Finer Foods, Inc.,* 695 F.Supp. 787, 792 (D.N.J.1988); *T & T Mfg. Co. v. A.T. Cross Co.,* 178 U.S.P.Q. 497, 501 (Trademark Tr.&App.Bd.1973) (color when applied to the goods in some definite manner or design, can function as a trademark to identify and distinguish one's goods in commerce).

■ In evaluating the appearance of the trade dress at issue, the court must consider the overall impression of the competing packages. *Knorr–Nahrmittel,* 695 F.Supp. at 790; *Ciba–Geigy Corp. v. Bolar Pharm. Co.,* 547

F.Supp. 1095, 1103 (D.N.J.1982), aff'd, 719 F.2d 56 (3d Cir.1983). The vantage point for the inquiry into whether the packages appear confusingly similar is not that of an expert but rather that of "the casual or ordinary, non-discerning buyer ... the test is one of general overall impression gained at a glance", not side-by-side comparison. McCarthy § 8:18; see also Fisons Horticulture, Inc. v. Vigoro Indus., Inc., 30 F.3d 466, 477 (3d Cir.1994); Ciba–Geigy, 547 F.Supp. at 1103.[13]

Rose Art seeks trade dress protection not for the overall appearance of a single product, but rather for the overall look of a series of packaging for three products—crayons, markers and colored pencils. Rose Art argues that its crayon, marker and colored pencil packages have a consistent and overall look which consumers associate with Rose Art. Geddes asserts that Rose Art does not have an identifiable trade dress because Rose Art's packaging for its different products does not present a consistent overall look. Specifically, Geddes points to the multiple background color combinations that Rose Art utilizes to package its crayon, marker and colored pencil products and Rose Art's inconsistent use of its Band and Letter Feature. Geddes also points to the variations in the appearance of Rose Art's logo. This Court agrees with Geddes and finds that Rose Art does not have an identifiable trade dress.

The Third Circuit has not addressed the burden which must be met by a plaintiff seeking trade dress protection for the overall look created by the packaging of a line or family of products. However, case law from other courts provides guidance on this issue.

■ The Second Circuit, the Fifth Circuit and district courts within the Second Circuit have recognized trade dress protection for a "uniform family trade dress." See Chevron

Chemical Co. v. Voluntary Purchasing Groups, Inc., 659 F.2d 695, 697 (5th Cir. 1981); Regal Jewelry Co., Inc. v. Kingsbridge Int'l, Inc., 999 F.Supp. 477, 486 (S.D.N.Y.1998) (Section 43(a) of the Lanham Act "can protect the trade dress of entire families of products") (citing Landscape Forms, Inc. v. Columbia Cascade Co., 113 F.3d 373, 380–81 (2d Cir.1997)); Harlequin Enter., Ltd. v. Gulf & Western Corp., 503 F.Supp. 647, aff'd, 644 F.2d 946 (2d Cir.1981); see also Time, Inc. Magazine Co. v. Globe Communications Corp., 712 F.Supp. 1103 (S.D.N.Y.1989). Thus, a party may have trade dress rights even though there are slight variations in its package design so long as the change does not alter the distinctive characteristics and the trade dress conveys a single and continuing commercial expression. See generally Beech–Nut Packing v. Lorillard Co., 299 F. 834, 849–50 (D.N.J.1924) (plaintiff may modernize and redecorate wrapper of tobacco product without loss of trademark rights), aff'd, 7 F.2d 967 (3d Cir. 1925), aff'd, 273 U.S. 629, 47 S.Ct. 481, 71 L.Ed. 810 (1927); see also Humble Oil & Ref. Co. v. Sekisui Chem. Co. Ltd. of Japan, 165 U.S.P.Q. 597, 603 (Trademark Tr. &App.Bd.1970) (change which does not alter mark's distinctive characteristics represents a continuation of plaintiff's rights; mark may be modified if mark retains single commercial impression).

■ Once a plaintiff demonstrates a consistent trade dress covering its line of products, the plaintiff must then show (1) that its trade dress is inherently distinctive or has acquired distinctiveness through secondary meaning; (2) the trade dress is non-functional; and (3) consumers are likely to confuse the source of the plaintiff's product with that of defendant's product. Duraco, 40 F.3d at

---

**13.** Geddes argues that the Court must conduct a side-by-side comparison of Rose Art's products and Geddes' products because the products are sold side-by-side in the marketplace. However, the law is clear that the applicable test is "whether the [packages] create the same overall impression when viewed separately." Fisons Horticulture, 30 F.3d at 477 (internal citations and quotations omitted). "In determining whether two [packages] are confusingly similar, appropriate test is not [a] side-by-side compari-

son of [the packages], emphasizing [the] differences in detail, but whether the average consumer, on encountering one [package] in isolated circumstances of [the] marketplace and having only [a] general recollection of the other, would likely confuse or associate the two." Id. at 477–78 (citing American Auto. Ass'n v. AAA Ins. Agency, Inc., 618 F.Supp. 787, 792 (W.D.Tex.1985)); see also Ciba–Geigy, 547 F.Supp. at 1103 ("likelihood of confusion cannot be assessed by a side-by-side comparison").

1439; *see also American Greetings,* 807 F.2d at 1141; *Regal Jewelry,* 999 F.Supp. at 486.

■ However, a plaintiff seeking trade dress protection for "a series or line of products faces the particularly difficult challenge of showing that the appearance of its several products is sufficiently distinct and unique to merit protection as a recognizable trade dress." *Landscape Forms,* 113 F.3d at 380.[14] "[T]his burden requires the plaintiff to articulate a specific trade dress and then to demonstrate that it has, in fact, consistently used that trade dress." *Regal Jewelry,* 999 F.Supp. at 486 (citations omitted). Furthermore, the Second Circuit has noted that "a claim of trade dress covering an array of items is likely to be broader than one for an individual product's [package]." *Landscape Forms,* 113 F.3d at 380. Therefore, "when protection is sought for an entire line of products, [the Court's] concern for protecting competition is acute." *Id.*

District courts confronted with claims for trade dress protection for an overall look created by different packages have imposed on plaintiffs a high "burden which most plaintiffs alleging trade dress infringement do not need to carry. [The plaintiff] must establish the existence of a recognizable trade dress ... [and] that its ... packages have a consistent overall look." *Walt Disney Co. v. Goodtimes Home Video Corp.,* 830 F.Supp. 762, 766 (S.D.N.Y.1993) [15]; *see also Innovative Networks, Inc. v. Satellite Airlines Ticketing Ctrs. Inc.,* 871 F.Supp. 709, 722 (S.D.N.Y.1995); *Casa Editrice Bonechi S.R.L. v. Irving Weisdorf & Co.,* 45 U.S.P.Q.2d 1360, 1363 (S.D.N.Y.1997); *Yankee Candle Co., Inc. v. New England Candle Co., Inc.,* 14 F.Supp.2d 154, 162 (D.Mass. 1998). If a plaintiff seeking trade dress protection cannot show that its packages have a "consistent overall took", the trade dress that

defendant is allegedly infringing "does not exist." *Walt Disney,* 830 F.Supp. at 768. Ultimately, Rose Art's claim fails because it has failed to show that its packages for its crayon, marker and colored pencil products have a consistent overall look.

The Fifth Circuit's analysis in *Chevron* is particularly instructive. In *Chevron,* the Court held that Chevron was entitled to an injunction barring its competitor from using the trade dress that Chevron had used for its more than 125 lawn and garden products. 659 F.2d at 705. The Chevron products were packaged in brown bottles with a yellow cap. *Id.* at 697. Each package had a label containing three horizontal colored bands. The top 20% of the label was white, the middle 30% of the label was yellow and the bottom 50% was red. *Id.* Chevron's "Ortho" trademark was printed on the white band in bold black letters, along with the distinctive chevron mark of the Chevron companies. *Id.* The yellow band contained the name of the particular product, e.g., Bone Meal, which was also printed in black letters. *Id.* The red band contained general warnings regarding toxicity, general information about the product and its ingredients and a drawing suggesting the uses for the product, e.g., insects which a particular pesticide will kill. *Id.* The print on this red band was partly in black and partly in white. *Id.* Further, Chevron had been using this trade dress for its Ortho products for 10 years.

The *Chevron* Court never specifically discussed whether section 43(a) of the Lanham can protect the trade dress of a family of products. However, the Court found that Chevron had been packaging its products in a "uniform family trade dress" and extended protection to Chevron's family trade dress. *See id.* at 697, 705.

---

14. *Landscape* was a product configuration case where the plaintiff sought protection for a line of commercial outdoor furniture, specifically trash cans and benches used in parks, airports and shopping malls. 113 F.3d at 375. The Second Circuit cited *Walt Disney* favorably for the proposition that a plaintiff seeking to protect an array of products faces a difficult challenge. *Id.* at 380.

15. As stated above, if a plaintiff shows that its packages have a consistent, overall look, this trade dress is entitled to protection under section 43(a) of the Lanham Act if (1) it is inherently distinctive or has acquired distinctiveness through secondary meaning, (2) it is nonfunctional and (3) the defendant's trade dress is likely to mislead consumers as to the source of its product. *See Walt Disney,* 830 F.Supp. at 766 (citing *Two Pesos,* 505 U.S. at 769, 112 S.Ct. 2753).

Similarly, in *Harlequin,* the Court found that the cover design of books in Harlequin's "Harlequin Presents" series constituted protectable trade dress because the format of each of the 372 volumes in the series was identical. 503 F.Supp. at 649. All the books in the Harlequin Presents series had a glossy white cover of six and three-quarter inches. *Id.* Each book bore the Harlequin trademark, a black and white sketch of a Harlequin located in a gold diamond, at the top of the cover with gold filigree [16] extending from both sides of the diamond. *Id.* Underneath the Harlequin mark was the title of the series, "Harlequin Presents". *Id.* The author's name was printed in large colored letters under the series title. *Id.* A thin gold line separated the author's name and the book's title, which was printed in lower case block letters. *Id.* at 649. Below the book title was a circular-shaped drawing featuring a man and a woman against a background of scenes depicting the story line. *Id.*

However, in *Walt Disney,* the Court found that Walt Disney's claimed trade dress did not exist and denied its motion for a preliminary injunction barring its competitor from using a video package design which resembled the packaging Walt Disney used for its Classic Animated Features. 830 F.Supp. at 763. Walt Disney sought trade dress protection for 17 video cassettes which it claimed comprised its family of Classic Animated Features. *Id.* at 764. All of the packages for which Walt Disney sought trade dress protection had a white clam shell container, the title of the story on the top third of the package and the name "Walt Disney" above the title (though not consistently in the same style or color of lettering). *Id.* at 767. Further, the packaging featured three-dimensional character depiction. *Id.* Before Walt Disney released its animated version of "Aladdin", defendant, a distributor of home video programs, hired a Wait Disney employee to design the cover of its Aladdin video cassette. *Id.* at 765.[17]

The Court noted that in seeking protection for the overall look of a number of different packages as opposed to trade dress protection for the appearance of a single package, Walt Disney faced the difficult burden of establishing that its video cassette packages had a consistent overall look. *Id.* at 766. The Court held that Walt Disney's video cassette packages for its Classic Animated Features collection did not have a consistent overall look which consumers associated with Walt Disney. *Id.* at 768. The Court determined that the differences in the package format of the different Classic Animated Features outweighed the similarities. The Court noted several differences in the format of each of the Walt Disney Classic Animated Features video cassette packages: variations in the size and style of title lettering and in the colors used for the lettering. In addition, the placement of the film title within the top third of the package varied, the use of the word "classic" appeared on some packages but not on others and the print for the word "classic" appeared in different sizes on different packages. Further, the Court noted that the placement, size of character illustrations and background colors varied for the different titles. *Id.* at 767–68. The Court concluded that despite the similarities in certain packaging features, the format of each of Walt Disney's video cassette packages was different, unlike the packages at issue in *Harlequin* and *Chevron. Id.* at 767.

Various courts have followed *Walt Disney* and held that a plaintiff seeking family trade dress protection for a line of products must first show that "the appearance of its several products is sufficiently distinct and unique to merit protection as a recognizable trade dress." *Regal Jewelry,* 999 F.Supp. at 486; *see also Landscape Forms,* 113 F.3d at 380–81. Thus, the courts, relying on *Walt Disney,* have held that a plaintiff must show that its packages have a "consistent overall look". *Yankee Candle,* 14 F.Supp.2d at 162; *Innovative Networks,* 871 F.Supp. at 722; *Casa Editrice,* 45 U.S.P.Q.2d at 1363.

16. Filigree is a pattern or design resembling ornamental work of fine wire of gold, silver or copper usually applied to gold or silver surfaces. Merriam–Webster's Collegiate Dictionary 435 (10th ed.1996).

17. When the artist designed the cover of defendant's Aladdin videocassette, the defendant mistakenly believed that the artist no longer worked for Walt Disney. *Id.* at 795.

■ This Court finds these opinions and their rationale persuasive. Thus, in determining whether Rose Art has an identifiable and protectable trade dress, this Court must ascertain whether the variations in Rose Art's package design are slight and convey an overall consistent look. For the following reasons, this Court concludes that the variations in Rose Art's package design are not slight but rather represent a kaleidoscope of color combinations and design formats which fail to convey a "consistent overall look" to the consumer. *See Walt Disney*, 830 F.Supp. at 766.

As stated *supra*, Rose Art asserts that its family of trade dress is characterized by the following elements: (1) the Band and Letter Feature [18]; (2) a yellow background on the top half or two-thirds of the package with a contrasting color on the bottom of the package; (3) a prominent display of the Rose Art logo either with or without a rainbow swish behind the logo; (4) the statement "since 1923"; (5) a statement on the front of the package that the product is "Certified Non-Toxic"; and (6) a sentence inviting consumer comments.

However, the evidence shows that Rose Art has not consistently applied the trade dress which it has articulated for its crayon, marker and colored pencil packages. Many of Rose Art's packages for crayons, markers and colored pencils are devoid of one or more of the six elements which Rose Art maintains make up its trade dress.

Rose Art argues that "[t]he Band and Letter Feature, the yellow top half and contrasting bottom half of the packages ... are always prominently displayed." Pl.'s Reply Br. in Supp. of Application for Prelim. Inj. at 3–4. However, certain packages of Rose Art crayons do not have a yellow background on the top of the package. *See* Pl.'s Hearing Ex. 2 (red background on top half of package); *see also* Amended Compl., Exs. D–4 & D–5 (black background on the top half of the package). Further, while most packages have a yellow background on the top half of the package, the shades of yellow vary from

a deep yellow, *see id.*, Ex. A–1, to a fluorescent light yellow. *See id.*, Exs. B–1 & B–3. In addition, Rose Art uses at least eight different background color combinations. *See* Amended Compl., Ex. A–1 (yellow on top, red on the bottom); Ex. B–4 (yellow on top, purple on the bottom); Ex. B–5 (yellow on top, bright pink on the bottom); Ex. C–2 (yellow on top, purple fade into red on the bottom); Ex. D–4 (black on top, bright pink on the bottom); *see also* Blackmon Cert., Ex. 64 (red on top, yellow on the bottom); Thomas Cert., Ex. 1 (pale lilac on top, magenta and purple on the bottom); Thomas Cert., Ex. 1 (pale lilac on top, magenta and royal blue on the bottom).

Rose Art seeks protection for its Band and Letter Feature. However, some packages of markers, crayons or colored pencils lack the Band and Letter Feature. *See* Rosen Cert., Ex. E. (Super Box of Crayons); Blackmon Cert., Ex. 21 (the Classic Colors), Ex. 22 (the Bold Colors), Ex. 65 (Super Jumbo Crayons); Thomas Cert., Ex. 4 (pre-school crayons), Ex. 5 (Super Rainbow Pack and Washable Markers). When the packaging for markers, crayons or colored pencils does have a Band and Letter Feature, Rose Art uses eight different colors for the band. *See* Amended Compl., Ex. A–1 (black), Ex. B–1 (purple), Ex. B–4 (bright pink), Ex. D–4 (neon green); *see* Blackmon Cert., Ex. 64 (light blue, royal blue, aquamarine); *see* Thomas Cert., Ex. 3 (grayish blue). Notably, the configuration of the band varies from straight, *see* Amended Compl., Ex. A–4, diagonal, *see id.*, Ex. A–1, or wobbly, *see id.*, Ex. A–8.

Rose Art also seeks protection for its logo, both with and without the rainbow swish behind it. Rose Art alleges that Geddes is imitating its logo by placing a rainbow swish behind the KidStuf mark. It is noteworthy that Rose Art changes the appearance of its logo constantly. The Rose Art logo appears in five different colors and. in three different textures. *See* Rosen Cert., Ex. C & Blackmon Cert., Ex. 64 (black); Amended Compl., Exs. A–6 & B–1 (yellow), Ex. A–8 (gold), Ex. C–1 (red), Ex. C–5 (red with a yellow out-

---

**18.** As stated *supra,* the Band and Letter Feature is comprised of a prominent straight or wavy black or colored band across the middle of the front of the package and extending to the sides with the product term in white letters across the band.

line); Blackmon Cert., Ex. 64 (white); Amended Compl., Ex. A–7 (flat texture), Ex. A–1 (logo outlined in gold), Exs. A–8 & A–12 (beveled texture). In some crayon, marker and pencil packages, the Rose Art name appears by itself without the rainbow swish. *See* Amended Compl. Ex., C–1. In other packages the Rose Art name is superimposed on a rainbow swish, *see id.*, Ex. A–1, or on a rainbow triangle, *see* Blackmon Cert., Ex. 64. When the swish does appear, there are at least four different color combinations. *See* Amended Compl., Ex. A–1 (bright pink to indigo to green), Ex. A–9 (blue to green to bright pink), Ex. B–2 (purple to blue to green), Ex. B–3 (yellow green to blue to purple). In addition, the rainbow swish appears in two different textures. *See id.*, Ex. A–1 (flat), Ex. B–4 (bubble with sparkle).

Rose Art asserts that the legend "since 1923" and its consumer legend are elements of its trade dress. *See* Pl.'s Br. in Supp. of Application for Prelim. Inj. at 3–4. However, not all packages of Rose Art crayons, markers or colored pencils display the statement "since 1923" on the package. *Compare* Amended Compl., Ex. A–1 *with* Ex. A–8. Similarly, some packages include the "Certified Non–Toxic" [19] seal, but others merely state "Non–Toxic". *See* Amended Compl., Exs. A–8 & A–1.[20]

Rose Art asserts that there are three subgroups within its trade dress: the Rose Art Primary Color Packaging, the Rose Art Neon Color Packaging and the Rose Art Color Fade Packaging. Rose Art contends that the Rose Art Primary Color Packaging is used to package traditional crayons and features, *inter alia*, a yellow background on the top half of the package and the Rose Art logo with the rainbow swish on the bottom of the package in front of a red or purple background. However, the evidence shows that Rose Art also packages its traditional crayons in a box with a red background on the top half of the package and a yellow background on the bottom, with the Rose Art logo displayed on the upper left hand corner of the box, superimposed on a triangle. *See* Blackmon Cert., Ex. 65. This package does not resemble the Rose Art Primary Color Packaging.

Rose Art asserts that the Rose Art Neon Color Packaging is used for wild color crayons and scented markers and features the Rose Art logo with the rainbow swish on the bottom of the package. However, the Court has found that the rainbow swish does not appear on all packages of scented markers. *See* Amended Compl., Ex. D–1.

Rose Art has stated that the Rose Art Color Fade Packaging is used for crayons, bold and classic markers and colored pencils. It features a black band with the product's descriptive term displayed in white letters across the band and a color fade from purple to red background on the bottom of the package. However, certain packages of bold and classic markers are devoid of any color fade or a black band with the product's term displayed in white letters. *See* Blackmon

---

**19.** Rose Art asserts that it has evidence that Geddes intentionally copied its trade dress. As evidence of intentional copying, Rose Art points to Geddes' consumer legend which provides: "We invite your comments about our product. Please write to: Raymond Geddes & Company, Consumer Affairs, P.O. Box 24829, Baltimore, MD 21220". Rose Art asserts that Geddes clearly copied this legend from Rose Art's consumer legend which states "Rose Art invites your comments and questions about this product. Please write to Rose Art Industries, Inc., Consumer Affairs, 6 Regent St., Livingston, NJ 07039 or call 1–800–CRAYONS". Rose Art also asserts that Geddes copied the term "since 1924" from Rose Art's packages which state "since 1923". Rose Art also contends that Geddes copied the phrase "Certified Non–Toxic" from Rose Art's packages. These three similarities may be evidence of intentional copying, however, intentional copying is irrelevant where the plaintiff has failed to show that it has a protectable trade dress. *See Casa Editrice*, 45 U.S.P.Q.2d at 1364 (if plaintiff's trade dress is not protectable, proof of intentional copying and secondary meaning cannot render it protectable); *see also Regal Jewelry*, 999 F.Supp. at 490 (ruling in defendant's favor even though there was evidence of intentional copying).

**20.** Rose Art claims that only the Arts & Creative Materials Institute can certify a product as non-toxic. Rose Art objects to Geddes' use of the term "Certified Non–Toxic" on its packages because the Arts & Creative Materials Institute has not certified Geddes' products as non-toxic. If certification from the Arts & Creative Materials Institute is indeed critical, Rose Art would certainly include such certification on all of its packages.

Cert., Ex. 21 (Classic color markers packaged in box with red background on the bottom of the package and the product's descriptive term displayed in blue letters on a white band).[21]

It is evident to the Court, and Rose Art has admitted, that in addition to the three styles of packaging that Rose Art has described, some of its packages combine features from more than one of the subgroups. *See* Amended Compl., Ex D. Thus, Rose Art "has not shown that it has consistently applied any" one trade dress to the packages of its crayon, marker and colored pencil products. *See Regal Jewelry*, 999 F.Supp. at 487. Rose Art's trade dress varies so widely that consumers cannot conclude that the products come from one source. Accordingly, this Court concludes that Rose Art uses numerous different styles of packaging for its crayons, markers and colored pencils such that its packaging fails to present a "consistent overall look" and does not qualify for trade dress protection under the law. *See Walt Disney*, 830 F.Supp. at 768.

In light of this Court's finding that Rose Art does not have an identifiable, protectable trade dress, the Court need not analyze the other elements of a trade dress infringement claim: (1) inherent distinctiveness or secondary meaning; (2) non-functionality; and (3) likelihood of confusion. *Duraco*, 40 F.3d at 1439. The requirements of a trademark infringement claim are conjunctive; thus failure to show an identifiable, protectable trade dress ends the inquiry. Since Rose Art has failed to satisfy the first prerequisite of a preliminary injunction—likelihood of success on the merits—Rose Art's motion is denied.

---

21. Sometimes Rose Art uses multiple package designs for the same exact product. *See* Amended Compl. Exs., A–6 & A–8, Blackmon Cert., Ex. 21 (different packaging for washable markers-classic colors); Amended Compl., Exs. A–3 & C–1, Blackmon Cert., Ex. 64 (different packaging for crayons).